537 U.S. 1231 123 S.Ct. 1382 155 L.Ed.2d 194
 KEVIN WIGGINS, PETITIONER
v.
SEWALL SMITH, WARDEN, ET AL.
 No. 02-311.
 Supreme Court of United States.
 Argued March 24, 2003.
 Decided June 26, 2003.
 
 In 1989, petitioner Wiggins was convicted of capital murder by a Maryland judge and subsequently elected to be sentenced by a jury. His public defenders, Schlaich and Nethercott, moved to bifurcate the sentencing, representing that they planned to prove that Wiggins did not kill the victim by his own hand and then, if necessary, to present a mitigation case. The court denied the motion. At sentencing, Nethercott told the jury in her opening statement that they would hear, among other things, about Wiggins' difficult life, but such evidence was never introduced. Before closing arguments and outside the presence of the jury, Schlaich made a proffer to the court to preserve the bifurcation issue for appeal, detailing the mitigation case counsel would have presented. Schlaich never mentioned Wiggins' life history or family background. The jury sentenced Wiggins to death, and the Maryland Court of Appeals affirmed. Represented by new counsel, Wiggins sought postconviction relief, arguing that his trial counsel had rendered ineffective assistance by failing to investigate and present mitigating evidence of his dysfunctional background. He presented expert testimony by a forensic social worker about the severe physical and sexual abuse he had suffered at the hands of his mother and while under the care of a series of foster parents. Schlaich testified that he did not remember retaining a forensic social worker to prepare a social history before sentencing, even though state funds were available for that purpose, and explained that he and Nethercott had decided to focus on retrying the factual case and disputing Wiggins' direct responsibility for the murder. The trial court denied the petition, and the State Court of Appeals affirmed, concluding that trial counsel had made a reasoned choice to proceed with what they considered their best defense. Subsequently,the Federal District Court granted Wiggins relief on his federal habeas petition, holding that the Maryland courts' rejection of his ineffective assistance claim involved an unreasonable application of clearly established federal law. In reversing, the Fourth Circuit found trial counsel's strategic decision to focus on Wiggins' direct responsibility to be reasonable.
 Held: The performance of Wiggins' attorneys at sentencing violated his Sixth Amendment right to effective assistance of counsel. Pp. 7—26.
 (a) A federal writ can be granted only if a state court decision "was contrary to, or involved an unreasonable application of, clearly established" precedents of this Court. 28 U. S. C. §2254(d)(1). This "unreasonable application" prong permits the writ to be granted when a state court identifies the correct governing legal principle but unreasonably applies it to the facts of a petitioner's case. Williams v. Taylor, 529 U. S. 362, 413. For this standard to be satisfied, the state court decision must have been "objectively unreasonable," id., at 409, not just incorrect or erroneous. An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. Strickland v. Washington, 466 U. S. 668, 687. Performance is deficient if it falls below an objective standard of reasonableness, which is defined in terms of prevailing professional norms. Id., at 688. Here, as in Strickland, counsel claim that their limited investigation into petitioner's background reflected a tactical judgment not to present mitigating evidence and to pursue an alternative strategy instead. In evaluating petitioner's claim, this Court's principal concern is not whether counsel should have presented a mitigation case, but whether the investigation supporting their decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. The Court thus conducts an objective review of their performance, measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time of that conduct. Id., at 688, 689. Pp. 7-10.
 (b) Counsel did not conduct a reasonable investigation. Their decision not to expand their investigation beyond a presentence investigation (PSI) report and Baltimore City Department of Social Services (DSS) records fell short of the professional standards prevailing in Maryland in 1989. Standard practice in Maryland capital cases at that time included the preparation of a social history report. Although there were funds to retain a forensic social worker, counsel chose not to commission a report. Their conduct similarly fell short of the American Bar Association's capital defense work standards. Moreover, in light of the facts counsel discovered in the DSS records concerning Wiggins' alcoholic mother and his problems in foster care,counsel's decision to cease investigating when they did was unreasonable. Any reasonably competent attorney would have realized that pursuing such leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of aggravating factors from Wiggins' background. Indeed, counsel discovered no evidence to suggest that a mitigation case would have been counterproductive or that further investigation would have been fruitless, thus distinguishing this case from precedents in which this Court has found limited investigations into mitigating evidence to be reasonable. The record of the sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly stemmed from inattention, not strategic judgment. Until the trial court denied their bifurcation motion, they had had every reason to develop the most powerful mitigation case possible. During the sentencing process itself, counsel did not focus exclusively on Wiggins' direct responsibility for the murder; rather they put on a halfhearted mitigation case instead. The Maryland Court of Appeals' assumption that counsel's investigation was adequate reflected an unreasonable application of Strickland. In deferring to counsel's decision not to present every conceivable mitigation defense despite the fact that counsel based their alleged choice on an inadequate investigation, the Maryland Court of Appeals further unreasonably applied Strickland. And the court's conclusion that the social services records revealed incidences of sexual abuse, when they in fact did not, reflects "an unreasonable determination of the facts in light of evidence presented in the State court proceeding," 28 U. S. C. §2254(d)(2). Contrary to the State's and the United States' contention, the record as a whole does not support the conclusion that counsel conducted a more thorough investigation than the one this Court describes. Ultimately, this Court's conclusion that counsel's investigation was inadequate does not mean that Strickland requires counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require counsel to present such evidence at sentencing in every case. Rather, the conclusion is based on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." Strickland, supra, at 690-691. Pp. 10—22.
 (c) Counsel's failures prejudiced Wiggins' defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding's result would have been different. Strickland, supra, at 694. ThisCourt assesses prejudice by reweighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. Williams v. Taylor, supra, 397-398. The mitigating evidence counsel failed to discover and present here is powerful. Wiggins experienced severe privation and abuse while in the custody of his alcoholic, absentee mother and physical torment, sexual molestation, and repeated rape while in foster care. His time spent homeless and his diminished mental capacities further augment his mitigation case. He thus has the kind of troubled history relevant to assessing a defendant's moral culpability. Penry v. Lynaugh, 492 U. S. 302, 319. Given the nature and extent of the abuse, there is a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing, and that a jury confronted with such mitigating evidence would have returned with a different sentence. The only significant mitigating factor the jury heard was that Wiggins had no prior convictions. Had it been able to place his excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance. Wiggins had no record of violent conduct that the State could have introduced to offset this powerful mitigating narrative. Thus, the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of his moral culpability. Pp. 22-26.
 288 F. 3d 629, reversed and remanded.
 O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined.
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT.
 JUSTICE O'CONNOR delivered the opinion of the Court.
 
 
 1
 Petitioner, Kevin Wiggins, argues that his attorneys' failure to investigate his background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings violated his Sixth Amendment right to counsel. In this case, we consider whether the United States Court of Appeals for the Fourth Circuit erred in upholding the Maryland Court of Appeals' rejection of this claim.
 
 
 2
 * A
 
 
 3
 On September 17, 1988, police discovered 77-year-old Florence Lacs drowned in the bathtub of her ransacked apartment in Woodlawn, Maryland. Wiggins v. State, 352 Md. 580, 585, 724 A. 2d 1, 5 (1999). The State indicted petitioner for the crime on October 20, 1988, and later filed a notice of intention to seek the death penalty. Two Baltimore County public defenders, Carl Schlaich and Michelle Nethercott, assumed responsibility for Wiggins' case. In July 1989, petitioner elected to be tried before a judge in Baltimore County Circuit Court. Ibid. OnAugust 4, after a 4-day trial, the court found petitioner guilty of first-degree murder, robbery, and two counts of theft. App. 32.
 
 
 4
 After his conviction, Wiggins elected to be sentenced by a jury, and the trial court scheduled the proceedings to begin on October 11, 1989. On September 11, counsel filed a motion for bifurcation of sentencing in hopes of presenting Wiggins' case in two phases. Id., at 34. Counsel intended first to prove that Wiggins did not act as a "principal in the first degree," ibid.—i.e., that he did not kill the victim by his own hand. See Md. Ann. Code, Art. 27, §413 (1996) (requiring proof of direct responsibility for death eligibility). Counsel then intended, if necessary, to present a mitigation case. In the memorandum in support of their motion, counsel argued that bifurcation would enable them to present each case in its best light; separating the two cases would prevent the introduction of mitigating evidence from diluting their claim that Wiggins was not directly responsible for the murder. App. 36-42, 37.
 
 
 5
 On October 12, the court denied the bifurcation motion, and sentencing proceedings commenced immediately thereafter. In her opening statement, Nethercott told the jurors they would hear evidence suggesting that someone other than Wiggins actually killed Lacs. Id., at 70-71. Counsel then explained that the judge would instruct them to weigh Wiggins' clean record as a factor against a death sentence. She concluded: "You're going to hear that Kevin Wiggins has had a difficult life. It has not been easy for him. But he's worked. He's tried to be a productive citizen, and he's reached the age of 27 with no convictions for prior crimes of violence and no convictions, period.... I think that's an important thing for you to consider." Id., at 72. During the proceedings themselves, however, counsel introduced no evidence of Wiggins' life history.
 
 
 6
 Before closing arguments, Schlaich made a proffer to thecourt, outside the presence of the jury, to preserve bifurcation as an issue for appeal. He detailed the mitigation case counsel would have presented had the court granted their bifurcation motion. He explained that they would have introduced psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other. See id., at 349-351. At no point did Schlaich proffer any evidence of petitioner's life history or family background. On October 18, the court instructed the jury on the sentencing task before it, and later that afternoon, the jury returned with a sentence of death. Id., at 409-410. A divided Maryland Court of Appeals affirmed. Wiggins v. State, 324 Md. 551, 597 A. 2d 1359 (1991), cert. denied, 503 U. S 1007 (1992).
 
 B
 
 7
 In 1993, Wiggins sought postconviction relief in Baltimore County Circuit Court. With new counsel, he challenged the adequacy of his representation at sentencing, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background. App. to Pet. for Cert. 132a. To support his claim, petitioner presented testimony by Hans Selvog, a licensed social worker certified as an expert by the court. App. 419. Selvog testified concerning an elaborate social history report he had prepared containing evidence of the severe physical and sexual abuse petitioner suffered at the hands of his mother and while in the care of a series of foster parents. Relying on state social services, medical, and school records, as well as interviews with petitioner and numerous family members, Selvog chronicled petitioner's bleak life history. App. to Pet. for Cert. 163a.
 
 
 8
 According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Id., at 166a-167a. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner—an incident that led to petitioner's hospitalization. Id., at 167a-171a. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, id., at 175a-176a, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. Id., at 176a-179a. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. Id., at 190a. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor. Id., at 192a.
 
 
 9
 During the postconviction proceedings, Schlaich testified that he did not remember retaining a forensic social worker to prepare a social history, even though the State made funds available for that purpose. App. 487-488. He explained that he and Nethercott, well in advance of trial, decided to focus their efforts on "retry[ing] the factual case" and disputing Wiggins' direct responsibility for the murder. Id., at 485-486. In April 1994, at the close of the proceedings, the judge observed from the bench that he could not remember a capital case in which counsel had not compiled a social history of the defendant, explaining, "[n]ot to do a social history, at least to see what you have got, to me is absolute error. I just—I would be flabbergasted if the Court of Appeals said anything else." Id., at605. In October 1997, however, the trial court denied Wiggins' petition for postconviction relief. The court concluded that "when the decision not to investigate . . . is a matter of trial tactics, there is no ineffective assistance of counsel." App. to Pet. for Cert. 155a—156a.
 
 
 10
 The Maryland Court of Appeals affirmed the denial of relief, concluding that trial counsel had made "a deliberate, tactical decision to concentrate their effort at convincing the jury" that appellant was not directly responsible for the murder. Wiggins v. State, 352 Md., at 608, 724 A. 2d, at 15. The court observed that counsel knew of Wiggins' unfortunate childhood. They had available to them both the presentence investigation (PSI) report prepared by the Division of Parole and Probation, as required by Maryland law, Md. Ann. Code, Art. 41, §4-609(d) (1988), as well as "more detailed social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation." 352 Md., at 608-609, 724 A. 2d, at 15. The court acknowledged that this evidence was neither as detailed nor as graphic as the history elaborated in the Selvog report but emphasized that "counsel did investigate and were aware of appellant's background." Id., at 610, 724 A. 2d, at 16 (emphasis in original). Counsel knew that at least one uncontested mitigating factor—Wiggins' lack of prior convictions— would be before the jury should their attempt to disprove Wiggins' direct responsibility for the murder fail. As a result, the court concluded, Schlaich and Nethercott "made a reasoned choice to proceed with what they thought was their best defense." Id., at 611-612, 724 A. 2d, at 17.
 
 C
 
 11
 In September 2001, Wiggins filed a petition for writ of habeas corpus in Federal District Court. The trial court granted him relief, holding that the Maryland courts'rejection of his ineffective assistance claim "involved an unreasonable application of clearly established federal law." Wiggins v. Corcoran, 164 F. Supp. 2d 538, 557 (2001) (citing Williams v. Taylor, 529 U. S. 362 (2000)). The court rejected the State's defense of counsel's "tactical" decision to "`retry guilt,'" concluding that for a strategic decision to be reasonable, it must be "based upon information the attorney has made after conducting a reasonable investigation." 164 F. Supp. 2d, at 558. The court found that though counsel were aware of some aspects of Wiggins' background, that knowledge did not excuse them from their duty to make a "fully informed and deliberate decision" about whether to present a mitigation case. In fact, the court concluded, their knowledge triggered an obligation to look further. Id., at 559.
 
 
 12
 Reviewing the District Court's decision de novo, the Fourth Circuit reversed, holding that counsel had made a reasonable strategic decision to focus on petitioner's direct responsibility. Wiggins v. Corcoran, 288 F. 3d 629, 639-640 (2002). The court contrasted counsel's complete failure to investigate potential mitigating evidence in Williams, 288 F. 3d, at 640, with the fact that Schlaich and Nethercott knew at least some details of Wiggins' childhood from the PSI and social services records, id., at 641. The court acknowledged that counsel likely knew further investigation "would have resulted in more sordid details surfacing," but agreed with the Maryland Court of Appeals that counsel's knowledge of the avenues of mitigation available to them "was sufficient to make an informed strategic choice" to challenge petitioner's direct responsibility for the murder. Id., at 641-642. The court emphasized that conflicting medical testimony with respect to the time of death, the absence of direct evidence against Wiggins, and unexplained forensic evidence at the crime scene supported counsel's strategy. Id., at 641.
 
 
 13
 We granted certiorari, 537 U. S. 1027 (2002), and nowreverse.
 
 II
 
 14
 * Petitioner renews his contention that his attorneys' performance at sentencing violated his Sixth Amendment right to effective assistance of counsel. The amendments to 28 U. S. C. §2254, enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), circumscribe our consideration of Wiggins' claim and require us to limit our analysis to the law as it was "clearly established" by our precedents at the time of the state court's decision. Section 2254 provides:
 
 
 15
 "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
 
 
 16
 "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
 
 
 17
 "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding."
 
 
 18
 We have made clear that the "unreasonable application" prong of §2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. Williams v. Taylor, supra, at 413; see also Bell v. Cone, 535 U. S. 685, 694 (2002). In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts differentfrom those of the case in which the principle was announced." Lockyer v. Andrade, 538 U. S. ___, ___ (2003) (slip op., at 12) (citing Williams v. Taylor, supra, at 407). In order for a federal court to find a state court's application of our precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous. See Lockyer, supra, at __ (slip op., at 11). The state court's application must have been "objectively unreasonable." See Williams v. Taylor, supra, at 409.
 
 
 19
 We established the legal principles that govern claims of ineffective assistance of counsel in Strickland v. Washington, 466 U. S. 668 (1984). An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. Id., at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id., at 688. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Ibid.
 
 
 20
 In this case, as in Strickland, petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence. Id., at 673. Here, as in Strickland, counsel attempt to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternate strategy instead. In rejecting Strickland's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments:
 
 
 21
 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made afterless than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id., at 690-691.
 
 
 22
 Our opinion in Williams v. Taylor is illustrative of the proper application of these standards. In finding Williams' ineffectiveness claim meritorious, we applied Strickland and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." 529 U. S., at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4—55 (2d ed. 1980)). While Williams had not yet been decided at the time the Maryland Court of Appeals rendered the decision at issue in this case, cf. post, at 5 (SCALIA, J., dissenting), Williams' case was before us on habeas review. Contrary to the dissent's contention, post, at 6, we therefore made no new law in resolving Williams' ineffectiveness claim. See Williams, 529 U. S., at 390 (noting that the merits of Williams' claim "are squarely governed by our holding in Strickland"); see also id., at 395 (noting that the trial court correctly applied both components of the Strickland standard to petitioner's claim and proceeding to discuss counsel's failure to investigate as a violation of Strickland's performance prong). In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides,we applied the same "clearly established" precedent of Strickland we apply today. Cf. Strickland, 466 U. S., at 690-691 (establishing that "thorough investigation[s]" are "virtually unchallengeable" and underscoring that "counsel has a duty to make reasonable investigations"); see also id., at 688-689 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable").
 
 
 23
 In light of these standards, our principal concern in deciding whether Schlaich and Nethercott exercised "reasonable professional judgmen[t]," id., at 691, is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. Ibid. Cf. Williams v. Taylor, supra, at 415 (O'CONNOR, J., concurring) (noting counsel's duty to conduct the "requisite, diligent" investigation into his client's background). In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," Strickland, 466 U. S., at 688, which includes a contextdependent consideration of the challenged conduct as seen "from counsel's perspective at the time," id., at 689 ("[E]very effort [must] be made to eliminate the distorting effects of hindsight").
 
 B
 
 24
 * The record demonstrates that counsel's investigation drew from three sources. App. 490-491. Counsel arranged for William Stejskal, a psychologist, to conduct a number of tests on petitioner. Stejskal concluded that petitioner had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder. Id., at 44-45, 349-351. These reportsrevealed nothing, however, of petitioner's life history. Tr. of Oral Arg. 24-25.
 
 
 25
 With respect to that history, counsel had available to them the written PSI, which included a one-page account of Wiggins' "personal history" noting his "misery as a youth," quoting his description of his own background as " `disgusting,' " and observing that he spent most of his life in foster care. App. 20—21. Counsel also "tracked down" records kept by the Baltimore City Department of Social Services (DSS) documenting petitioner's various placements in the State's foster care system. Id., at 490; Lodging of Petitioner. In describing the scope of counsel's investigation into petitioner's life history, both the Fourth Circuit and the Maryland Court of Appeals referred only to these two sources of information. See 288 F. 3d, at 640-641; Wiggins v. State, 352 Md., at 608—609, 724 A. 2d, at 15.
 
 
 26
 Counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989. As Schlaich acknowledged, standard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report. App. 488. Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. Id., at 487. Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as "guides to determining what is reasonable." Strickland, supra, at 688; Williams v. Taylor, supra, at 396. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointmentand Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. id., 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing.... Investigation is essential to fulfillment of these functions").
 
 
 27
 The scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records. The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food. See Lodging of Petitioner 54-95, 126, 131-136, 140, 147, 159-176. As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background. 164 F. Supp. 2d, at 559. Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless; this case is therefore distinguishable from our precedents in which we have foundlimited investigations into mitigating evidence to be reasonable. See, e.g., Strickland, 466 U. S., at 699 (concluding that counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); Burger v. Kemp, 483 U. S. 776, 794 (1987) (concluding counsel's limited investigation was reasonable because he interviewed all witnesses brought to his attention, discovering little that was helpful and much that was harmful); Darden v. Wainwright, 477 U. S. 168, 186 (1986) (concluding that counsel engaged in extensive preparation and that the decision to present a mitigation case would have resulted in the jury hearing evidence that petitioner had been convicted of violent crimes and spent much of his life in jail). Had counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings.
 
 
 28
 The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment. Counsel sought, until the day before sentencing, to have the proceedings bifurcated into a retrial of guilt and a mitigation stage. See supra, at 2. On the eve of sentencing, counsel represented to the court that they were prepared to come forward with mitigating evidence, App. 45, and that they intended to present such evidence in the event the court granted their motion to bifurcate. In other words, prior to sentencing, counsel never actually abandoned the possibility that they would present a mitigation defense. Until the court denied their motion, then, they had every reason to develop the most powerful mitigation case possible.
 
 
 29
 What is more, during the sentencing proceeding itself, counsel did not focus exclusively on Wiggins' direct responsibility for the murder. After introducing that issue in her opening statement, id., at 70-71, Nethercott entreatedthe jury to consider not just what Wiggins "is found to have done," but also "who [he] is." Id., at 70. Though she told the jury it would "hear that Kevin Wiggins has had a difficult life," id., at 72, counsel never followed up on that suggestion with details of Wiggins' history. At the same time, counsel called a criminologist to testify that inmates serving life sentences tend to adjust well and refrain from further violence in prison—testimony with no bearing on whether petitioner committed the murder by his own hand. Id., at 311—312. Far from focusing exclusively on petitioner's direct responsibility, then, counsel put on a halfhearted mitigation case, taking precisely the type of "shotgun" approach the Maryland Court of Appeals concluded counsel sought to avoid. Wiggins v. State, 352 Md., at 609, 724 A. 2d, at 15. When viewed in this light, the "strategic decision" the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.
 
 
 30
 In rejecting petitioner's ineffective assistance claim, the Maryland Court of Appeals appears to have assumed that because counsel had some information with respect to petitioner's background—the information in the PSI and the DSS records—they were in a position to make a tactical choice not to present a mitigation defense. Id., at 611— 612, 724 A. 2d, at 17 (citing federal and state precedents finding ineffective assistance in cases in which counsel failed to conduct an investigation of any kind). In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming Schlaich and Nethercott limited the scope of their investigation for strategic reasons, Strickland does not establish that a cursory investigationautomatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy. 466 U. S., at 691.
 
 
 31
 The Maryland Court of Appeals' application of Strickland's governing legal principles was objectively unreasonable. Though the state court acknowledged petitioner's claim that counsel's failure to prepare a social history "did not meet the minimum standards of the profession," the court did not conduct an assessment of whether the decision to cease all investigation upon obtaining the PSI and the DSS records actually demonstrated reasonable professional judgment. Wiggins v. State, 352 Md., at 609, 724 A. 2d, at 16. The state court merely assumed that the investigation was adequate. In light of what the PSI and the DSS records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible. The Court of Appeals' assumption that the investigation was adequate, ibid., thus reflected an unreasonable application of Strickland. 28 U. S. C. §2254(d)(1). As a result, the court's subsequent deference to counsel's strategic decision not "to present every conceivable mitigation defense," 352 Md., at 610, 724 A. 2d, at 16, despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable. As we established in Strickland, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U. S., at 690—691.
 
 
 32
 Additionally, the court based its conclusion, in part, on a clear factual error—that the "social service records . . . recorded incidences of . . . sexual abuse." 352 Md., at 608— 609, 724 A. 2d, at 15. As the State and the United Statesnow concede, the records contain no mention of sexual abuse, much less of the repeated molestations and rapes of petitioner detailed in the Selvog report. Brief for Respondents 22; Brief for United States as Amicus Curiae 26; App. to Pet. for Cert. 175a—179a, 190a. The state court's assumption that the records documented instances of this abuse has been shown to be incorrect by "clear and convincing evidence," 28 U. S. C. §2254(e)(1), and reflects "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," §2254(d)(2). This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision.
 
 
 33
 The dissent insists that this Court's hands are tied, under §2254(d), "by the state court's factual determinations that Wiggins' trial counsel `did investigate and were aware of [Wiggins'] background,'" post, at 14. But as we have made clear, the Maryland Court of Appeals' conclusion that the scope of counsel's investigation into petitioner's background met the legal standards set in Strickland represented an objectively unreasonable application of our precedent. §2254(d)(1). Moreover, the court's assumption that counsel learned of a major aspect of Wiggins' background, i.e., the sexual abuse, from the DSS records was clearly erroneous. The requirements of §2254(d) thus pose no bar to granting petitioner habeas relief.
 
 2
 
 34
 In their briefs to this Court, the State and the United States contend that counsel, in fact, conducted a more thorough investigation than the one we have just described. This conclusion, they explain, follows from Schlaich's postconviction testimony that he knew of the sexual abuse Wiggins suffered, as well as of the handburning incident. According to the State and its amicus,the fact that counsel claimed to be aware of this evidence, which was not in the social services records, coupled with Schlaich's statement that he knew what was in "other people's reports," App. 490—491, suggests that counsel's investigation must have extended beyond the social services records. Tr. of Oral Arg. 31—36; Brief for United States as Amicus Curiae 26—27, n. 4; Brief for Respondents 35. Schlaich simply "was not asked to and did not reveal the source of his knowledge" of the abuse. Brief for United States as Amicus Curiae 27, n. 4.
 
 
 35
 In considering this reading of the state postconviction record, we note preliminarily that the Maryland Court of Appeals clearly assumed both that counsel's investigation began and ended with the PSI and the DSS records and that this investigation was sufficient in scope to satisfy Strickland's reasonableness requirement. See Wiggins v. State, 352 Md., at 608, 724 A. 2d, at 15. The court also assumed, erroneously, that the social services records cited incidences of sexual abuse. See id., at 608—609, 724 A. 2d, at 15. Respondents' interpretation of Schlaich's postconviction testimony therefore has no bearing on whether the Maryland Court of Appeals' decision reflected an objectively unreasonable application of Strickland.
 
 
 36
 In its assessment of the Maryland Court of Appeals' opinion, the dissent apparently does not dispute that if counsel's investigation in this case had consisted exclusively of the PSI and the DSS records, the court's decision would have constituted an unreasonable application of Strickland. See post, at 7. Of necessity, then, the dissent's primary contention is that the Maryland Court of Appeals did decide that Wiggins' counsel looked beyond the PSI and the DSS records and that we must therefore defer to that finding under §2254(e)(1). See post, at 7—14. Had the court found that counsel's investigation extended beyond the PSI and the DSS records, the dissent, of course, would be correct that §2254(e) would require thatwe defer to that finding. But the state court made no such finding.
 
 
 37
 The dissent bases its conclusion on the Maryland Court of Appeals' statements that "[c]ounsel were aware that appellant had a most unfortunate childhood," and that "counsel did investigate and were aware of appellant's background." See post, at 3—4, 8 (quoting Wiggins v. State, supra, at 608, 610, 724 A. 2d, at 15, 16). But the state court's description of how counsel learned of petitioner's childhood speaks for itself. The court explained: "Counsel were aware that appellant had a most unfortunate childhood. Mr. Schlaich had available to him not only the presentence investigation report . . . but also more detailed social service records." See 352 Md., at 608—609, 724 A. 2d, at 15. This construction reflects the state court's understanding that the investigation consisted of the two sources the court mentions. Indeed, when describing counsel's investigation into petitioner's background, the court never so much as implies that counsel uncovered any source other than the PSI and the DSS records. The court's conclusion that counsel were aware of "incidences. . . of sexual abuse" does not suggest otherwise, cf. post, at 8, because the court assumed that counsel learned of such incidents from the social services records. Wiggins v. Corcoran, 352 Md., at 608—609, 724 A. 2d, at 15.
 
 
 38
 The court's subsequent statement that, "as noted, counsel did investigate and were aware of appellant's background," underscores our conclusion that the Maryland Court of Appeals assumed counsel's investigation into Wiggins' childhood consisted of the PSI and the DSS records. The court's use of the phrase "as noted," which the dissent ignores, further confirms that counsel's investigation consisted of the sources previously described, i.e., the PSI and the DSS records. It is the dissent, therefore, that "rests upon a fundamental fallacy," post, at 7,—that the Maryland Court of Appeals determined that Schlaich'sinvestigation extended beyond the PSI and the DSS records.
 
 
 39
 We therefore must determine, de novo, whether counsel reached beyond the PSI and the DSS records in their investigation of petitioner's background. The record as a whole does not support the conclusion that counsel conducted a more thorough investigation than the one we have described. The dissent, like the State and the United States, relies primarily on Schlaich's postconviction testimony to establish that counsel investigated more extensively. But the questions put to Schlaich during his postconviction testimony all referred to what he knew from the social services records; the line of questioning, after all, first directed him to his discovery of those documents. His subsequent reference to "other people's reports," made in direct response to a question concerning petitioner's mental retardation, appears to be an acknowledgement of the psychologist's reports we know counsel commissioned —reports that also revealed nothing of the sexual abuse Wiggins experienced. App. 349. As the state trial judge who heard this testimony concluded at the close of the proceedings, there is "no reason to believe that [counsel] did have all of this information." Id., at 606 (emphasis added).
 
 
 40
 The State maintained at oral argument that Schlaich's reference to "other people's reports" indicated that counsel learned of the sexual abuse from sources other than the PSI and the DSS records. Tr. of Oral Arg. 31, 33, 35. But when pressed repeatedly to identify the sources counsel might have consulted, the State acknowledged that no written reports documented the sexual abuse and speculated that counsel must have learned of it through "[o]ral reports" from Wiggins himself. Id., at 36. Not only would the phrase "other people's reports" have been an unusual way for counsel to refer to conversations with his client, but the record contains no evidence that counsel everpursued this line of questioning with Wiggins. See id., at 24. For its part, the United States emphasized counsel's retention of the psychologist. Id., at 51; Brief for United States as Amicus Curiae 27. But again, counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background. Though Stejskal based his conclusions on clinical interviews with Wiggins, as well as meetings with Wiggins' family members, Lodging of Petitioner, his final report discussed only petitioner's mental capacities and attributed nothing of what he learned to Wiggins' social history.
 
 
 41
 To further underscore that counsel did not know, prior to sentencing, of the sexual abuse, as well as of the other incidents not recorded in the DSS records, petitioner directs us to the content of counsel's October 17, 1989, proffer. Before closing statements and outside the presence of the jury, Schlaich proffered to the court the mitigation case counsel would have introduced had the court granted their motion to bifurcate. App. 349—351. In his statement, Schlaich referred only to the results of the psychologist's test and mentioned nothing of Wiggins' troubled background. Given that the purpose of the proffer was to preserve their pursuit of bifurcation as an issue for appeal, they had every incentive to make their mitigation case seem as strong as possible. Counsel's failure to include in the proffer the powerful evidence of repeated sexual abuse is therefore explicable only if we assume that counsel had no knowledge of the abuse.
 
 
 42
 Contrary to the dissent's claim, see post, at 10, we are not accusing Schlaich of lying. His statements at the postconviction proceedings that he knew of this abuse, as well as of the hand-burning incident, may simply reflect a mistaken memory shaped by the passage of time. After all, the state postconviction proceedings took place over four years after Wiggins' sentencing. Ultimately, given counsel's likely ignorance of the history of sexual abuse atthe time of sentencing, we cannot infer from Schlaich's postconviction testimony that counsel looked further than the PSI and the DSS records in investigating petitioner's background. Indeed, the record contains no mention of sources other than those it is undisputed counsel possessed, see supra, at 10. We therefore conclude that counsel's investigation of petitioner's background was limited to the PSI and the DSS records.
 
 3
 
 43
 In finding that Schlaich and Nethercott's investigation did not meet Strickland's performance standards, we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of Strickland. 466 U. S., at 689. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." Id., at 690—691. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." Id., at 691.
 
 
 44
 Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records—evidence that would have led a reasonably competent attorney to investigate further. Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigationcase suggest that their incomplete investigation was the result of inattention, not reasoned strategic judgment. In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied Strickland. Furthermore, the court partially relied on an erroneous factual assumption. The requirements for habeas relief established by 28 U. S. C. §2254(d) are thus satisfied.
 
 III
 
 45
 In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. Strickland, 466 U. S., at 692. In Strickland, we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence. In this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the Strickland analysis.
 
 
 46
 The mitigating evidence counsel failed to discover and present in this case is powerful. As Selvog reported based on his conversations with Wiggins and members of his family, see Reply Brief for Petitioner 18—19, Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, furtheraugment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability. Penry v. Lynaugh, 492 U. S. 302, 319 (1989) ("`[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'"); see also Eddings v. Oklahoma, 455 U. S. 104, 112 (1982) (noting that consideration of the offender's life history is a "`part of the process of inflicting the penalty of death'"); Lockett v. Ohio, 438 U. S. 586, 604 (1978) (invalidating Ohio law that did not permit consideration of aspects of a defendant's background).
 
 
 47
 Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form. While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive. Moreover, given the strength of the available evidence, a reasonable attorney may well have chosen to prioritize the mitigation case over the direct responsibility challenge, particularly given that Wiggins' history contained little of the double edge we have found to justify limited investigations in other cases. Cf. Burger v. Kemp, 483 U. S. 776 (1987); Darden v. Wainwright, 477 U. S. 168 (1986).
 
 
 48
 The dissent nevertheless maintains that Wiggins' counsel would not have altered their chosen strategy of focusing exclusively on Wiggins' direct responsibility for the murder. See post, at 17. But as we have made clear, counsel were not in a position to make a reasonable strategic choice as to whether to focus on Wiggins' direct responsibility, the sordid details of his life history, or both,because the investigation supporting their choice was unreasonable. See supra, at 11—14. Moreover, as we have noted, see supra, at 13, Wiggins' counsel did not focus solely on Wiggins' direct responsibility. Counsel told the sentencing jury "you're going to hear that Kevin Wiggins has had a difficult life," App. 72, but never followed up on this suggestion.
 
 
 49
 We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence. In reaching this conclusion, we need not, as the dissent suggests, post, at 17—20, make the state-law evidentiary findings that would have been at issue at sentencing. Rather, we evaluate the totality of the evidence —"both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." Williams v. Taylor, 529 U. S., at 397—398 (emphasis added).
 
 
 50
 In any event, contrary to the dissent's assertion, it appears that Selvog's report may have been admissible under Maryland law. In Whittlesey v. Maryland, 340 Md. 30, 665 A. 2d 223 (1995), the Maryland Court of Appeals vacated a trial court decision excluding, on hearsay grounds, testimony by Selvog himself. The court instructed the trial judge to exercise its discretion to admit "any relevant and reliable mitigating evidence, including hearsay evidence that might not be admissible in the guilt-or-innocence phase of the trial." Id., at 73, 665 A. 2d, at 244. This "relaxed standard," the court observed, would provide the factfinder with "the opportunity to consider `any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" Ibid. See also Ball v. State, 347 Md. 156, 172— 173, 699 A. 2d 1170, 1177 (1997) (noting that the trial judge had admitted Selvog's social history report on the defendant). While the dissent dismisses the contents of the social history report, calling Wiggins a "liar" and hisclaims of sexual abuse "uncorroborated gossip," post, at 18, 19, Maryland appears to consider this type of evidence relevant at sentencing, see Whittlesey, supra, at 71, 665 A. 2d, at 243 ("The reasons for relaxing the rules of evidence apply with particular force in the death penalty context"). Not even the State contests that Wiggins suffered from the various types of abuse and neglect detailed in the PSI, the DSS records, and Selvog's social history report.
 
 
 51
 Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance. Cf. Borchardt v. Maryland, 367 Md. 91, 139—140, 786 A. 2d 631, 660 (2001) (noting that as long as a single juror concludes that mitigating evidence outweighs aggravating evidence, the death penalty cannot be imposed); App. 369 (instructing the jury: "If you unanimously find that the State has proven by a preponderance of the evidence that the aggravating circumstance does outweigh the mitigating circumstances, then consider whether death is the appropriate sentence").
 
 
 52
 Moreover, in contrast to the petitioner in Williams v. Taylor, supra, Wiggins does not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative. Cf. id., at 418 (REHNQUIST, C. J., dissenting) (noting that Williams had savagely beaten an elderly woman, stolen two cars, set fire to a home, stabbed a man during a robbery, and confessed to choking two inmates and breaking a fellow prisoner's jaw). As the Federal District Court found, the mitigating evidence in this case is stronger, and the State's evidence in support of the death penalty far weaker, than in Williams, where we found prejudice as the result of counsel's failure to investigate and present mitigating evidence. Id.,at 399. We thus conclude that the available mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of Wiggins' moral culpability. 529 U. S., at 398. Accordingly, the judgment of the United States Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.
 
 
 53
 It is so ordered.JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.
 
 
 54
 The Court today vacates Kevin Wiggins' death sentence on the ground that his trial counsel's investigation of potential mitigating evidence was "incomplete." Ante, at 18. Wiggins' trial counsel testified under oath, however, that he was aware of the basic features of Wiggins' troubled childhood that the Court claims he overlooked. App. 490—491. The Court chooses to disbelieve this testimony for reasons that do not withstand analysis. Moreover, even if this disbelief could plausibly be entertained, that would certainly not establish (as 28 U. S. C. §2254(d) requires) that the Maryland Court of Appeals was unreasonable in believing it, and in therefore concluding that counsel adequately investigated Wiggins' background. The Court also fails to observe §2254(e)(1)'s requirement that federal habeas courts respect state-court factual determinations not rebutted by "clear and convincing evidence." The decision sets at naught the statutory scheme we once described as a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U. S. 320, 333, n. 7 (1997). I respectfully dissent.
 
 
 55
 * Wiggins claims that his death sentence violates Stricklandv. Washington, 466 U. S. 668 (1984), because his trial attorneys, had they further investigated his background, would have learned—and could have presented to the jury—the following evidence: (1) According to family members, Wiggins' mother was an alcoholic who neglected her children and failed to feed them properly, App. to Pet. for Cert. 165a—169a; (2) according to Wiggins and his sister India, Wiggins' mother intentionally burned 5-yearold Wiggins' hands on a kitchen stove as punishment for playing with matches, id., at 169a—171a; (3) Wiggins was placed in foster care at age six because of his mother's neglect, and was moved in and out of various foster families, id., at 173a—192a; (4) According to Wiggins, one of his foster parents sexually abused him "`two or three times a week, sometimes every day,'" when he was eight years old, id., at 177a—179a; (5) According to Wiggins, at age 16 he was knocked unconscious and raped by two of his foster mother's teenage children, id., at 190a; (6) According to Wiggins, when he joined the Job Corps at age 18 a Job Corps administrator "`made sexual advances . . . and they became sexually involved," id., at 192a—193a (later, according to Wiggins, the Job Corps supervisor drugged him and when Wiggins woke up, he "knew he had been anally penetrated," id., at 193a); and (7) Wiggins is "borderline" mentally retarded, id., at 193a—194a. All this information is contained in a "social history" report prepared by social worker Hans Selvog for use in the state postconviction proceedings.
 
 
 56
 In those proceedings, Carl Schlaich (one of Wiggins' two trial attorneys) testified that, although he did not retain a social worker to assemble a "social history" report, he nevertheless had detailed knowledge of Wiggins' background:
 
 
 57
 "`Q But you knew that Mr. Wiggins, Kevin Wiggins, had been removed from his natural mother as a resultof a finding of neglect and abuse when he was six years old, is that correct?
 
 
 58
 "`A I believe that we tracked all of that down.
 
 
 59
 "`Q You got the Social Service records?
 
 
 60
 "`A That is what I recall.
 
 
 61
 "`Q That was in the Social Service records?
 
 
 62
 "`A Yes.
 
 
 63
 "`Q So you knew that?
 
 
 64
 "`A Yes.
 
 
 65
 "`Q You also knew that where [sic] were reports of sexual abuse at one of his foster homes?
 
 
 66
 "`A Yes.
 
 
 67
 "`Q Okay. You also knew that he had had his hands burned as a child as a result of his mother's abuse of him?
 
 
 68
 "`A Yes.
 
 
 69
 "`Q You also knew about homosexual overtures made toward him by his Job Corp supervisor?
 
 
 70
 "`A Yes.
 
 
 71
 "`Q And you also knew that he was borderline mentally retarded?
 
 
 72
 "`A Yes.
 
 
 73
 "`Q You knew all—
 
 
 74
 "`A At least I knew that as it was reported in other people's reports, yes.
 
 
 75
 "`Q But you knew it?
 
 
 76
 "`A Yes.'" App. 490—491.
 
 
 77
 In light of this testimony, the Maryland Court of Appeals found that "counsel did investigate and were aware of [Wiggins'] background," Wiggins v. State, 352 Md. 580,610, 724 A. 2d, 1, 16 (1999) (emphasis in original), and, specifically, that "[c]ounsel were aware that [Wiggins] had a most unfortunate childhood," id., at 608, 724 A. 2d, at 15. These state-court determinations of factual issues are binding on federal habeas courts, including this Court, unless rebutted by clear and convincing evidence.[1] Relying on these factual findings, the Maryland Court of Appeals rejected Wiggins' claim that his trial attorneys failed adequately to investigate potential mitigating evidence. Wiggins' trial counsel, it said, "did not have as detailed or graphic a history as was prepared by Mr. Selvog, but that is not a Constitutional deficiency. See Gilliam v. State, 331 Md. 651, 680—82, 629 A. 2d 685, 700—02 (1993), cert. denied, 510 U. S. 1077 . . . (1994); Burger v. Kemp, 483 U. S. 776, 788—96 . . . (1987)." Id., at 610, 724 A. 2d, at 16.
 
 
 78
 The state court having adjudicated Wiggins' Sixth Amendment claim on the merits, 28 U. S. C. §2254(d) bars habeas relief unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," §2254(d)(2). The Court concludes without foundation that the Maryland Court of Appeals decision failed both these tests. I shall discuss each in turn.
 
 
 79
 * In concluding that the Maryland Court of Appeals unreasonablyapplied our clearly established precedents, the Court disregards §2254(d)(1)'s command that only "clearly established Federal law, as determined by the Supreme Court of the United States" be used in assessing the reasonableness of state-court decisions. Further, the Court misdescribes the state court's opinion while ignoring §2254(e)(1)'s requirement that federal habeas courts respect state-court factual determinations.
 
 
 80
 * We have defined "clearly established Federal law, as determined by the Supreme Court of the United States" to encompass "the holdings . . . of this Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U. S. 362, 412 (2000) (emphasis added). Yet in discussing what our precedents have "clearly established" with respect to ineffectiveness claims, the Court relies upon a case—Williams v. Taylor, supra—that postdates the Maryland court's decision rejecting Wiggins' Sixth Amendment claim. See ante, at 9. The Court concedes that Williams was not "clearly established Federal law" at the time of the Maryland Court of Appeals' decision, ante, at 9, yet believes that it may ignore §2254(d)'s strictures on the ground that "Williams' case was before us on habeas review, and we therefore made no new law in resolving his ineffectiveness claim," ibid. The Court is wrong— in both its premise and its conclusion.
 
 
 81
 Although Williams was a habeas case, we reviewed the first prong of the habeas petitioner's Strickland claim— the inadequate-performance question—de novo. Williams had surmounted §2254(d)'s bar to habeas relief because we held that the Virginia Supreme Court's analysis with respect to Strickland's second prong—the prejudice prong—was both "contrary to," and "an unreasonable application of," our clearly established precedents. See Williams, supra, at 393-394, 397. That left us free to provide habeas relief—and since the State had not raiseda Teague defense, see Teague v. Lane, 489 U. S. 288 (1989), we proceeded to analyze the inadequateperformance contention de novo, rather than under "clearly established" law. That is clear from the fact that we cited no cases in our discussion of the inadequateperformance question, see 529 U. S., at 395-396. The Court is mistaken to assert that this discussion "made no new law," ante, at 9. There was nothing in Strickland, or in any of our "clearly established" precedents at the time of the Virginia Supreme Court's decision, to support Williams' statement that trial counsel had an "obligation to conduct a thorough investigation of the defendant's background," 529 U. S., at 396. That is why the citation supporting the statement is not one of our opinions, but rather standards promulgated by the American Bar Association, ibid. (citing ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)). Insofar as this Court's cases were concerned, Burger v. Kemp, 483 U. S. 776, 794 (1987), had rejected an ineffective-assistance claim even though acknowledging that trial counsel "could well have made a more thorough investigation than he did." And Strickland had eschewed the imposition of such "rules" on counsel, 466 U. S., at 688-689, specifically stating that the very ABA standards upon which Williams later relied "are guides to determining what is reasonable, but they are only guides." 466 U. S., at 688 (emphasis added). Williams did make new law—law that was not "clearly established" at the time of the Maryland Court of Appeals' decision.
 
 
 82
 But even if the Court were correct in its characterization of Williams, that still cannot justify its decision to ignore an Act of Congress. Whether Williams "made new law" or not, what Williams held was not clearly established Supreme Court precedent as of the time of the state court's decision, and cannot be used to find fault in the state court opinion. §2254(d)(1) means what it says, andthe Court simply defies the congressionally imposed limits on federal habeas review.
 
 2
 
 83
 The Court concludes that Strickland was applied unreasonably (and §2254(d)(1) thereby satisfied) because the Maryland Court of Appeals' conclusion that trial counsel adequately investigated Wiggins' background, see Wiggins, 352 Md., at 610, 724 A. 2d, at 16, was unreasonable. That assessment cannot possibly be sustained, particularly in light of the state court's factual determinations that bind this Court under §2254(e)(1). The Court's analysis of this point rests upon a fundamental fallacy: that the state court "clearly assumed that counsel's investigation began and ended with the PSI and the DSS records," ante, at 16. That is demonstrably not so. The state court did observe that Wiggins' trial attorneys "had available" the presentence investigation (PSI) report and the Maryland Department of Social Services (DSS) reports, Wiggins, supra, at 608-609, 724 A. 2d, at 15-16, but there is absolutely nothing in the state-court opinion that says (or assumes) that these were the only sources on which counsel relied. It is rather this Court that makes such an assumption—or rather, such a bald assertion, see ante, at 14 (asserting that counsel "cease[d] all investigation" upon receipt of the PSI and DSS reports); ante, at 11 (referring to "[c]ounsel's decision not to expand their investigation beyond the PSI and DSS records").
 
 
 84
 Nor could the Maryland Court of Appeals have "assumed" that Wiggins' trial counsel looked no further than the PSI and DSS reports, because the state-court record is clear that Wiggins' trial attorneys had investigated well beyond these sources. Public-defender investigators interviewed Wiggins' family members, see Defendant's Supplemental Answer to State's Discovery Request filed in No. 88-CR-5464 (Cir. Ct. Baltimore Cty., Md., Sept. 18, 1989), Lodging of Respondents, and Wiggins' trial attorneyshired a psychologist, Dr. William Stejskal (who reviewed the DSS records, conducted clinical interviews, and performed six different psychological tests of Wiggins, ibid.; App. 349-351), and a criminologist, Dr. Robert Johnson (who interviewed Wiggins and testified that Wiggins would adjust adequately to life in prison, id., at 319-321). Schlaich also testified in the state postconviction proceedings that he knew information about Wiggins' background that was not contained in the DSS or PSI reports— such as the allegation that Wiggins' mother burned his hands as a child, id., at 490—so Schlaich must have investigated sources beyond these reports.
 
 
 85
 As the Court notes, ante, at 17-18, the Maryland Court of Appeals did not expressly state that counsel's investigation extended beyond the PSI and DSS records. There was no reason whatever to do so, since it had found that "counsel did investigate and were aware of appellant's background," Wiggins, supra, at 610, 724 A. 2d, at 16, and since that finding was based on a state-court record that clearly demonstrates investigation beyond the PSI and DSS reports. The court's failure to recite what is obvious from the record surely provides no basis for believing that it stupidly "assumed" the opposite of what is obvious from the record.
 
 
 86
 Once one eliminates the Court's mischaracterization of the state-court opinion—which did not and could not have "assumed" that Wiggins' counsel knew only what was contained in the DSS and PSI reports—there is no basis for finding it "unreasonable" to believe that counsel's investigation was adequate. As noted earlier, Schlaich testified in the state postconviction proceedings that he was aware of the essential items contained in the laterprepared "social history" report. He knew that Wiggins was subjected to neglect and abuse from his mother, App. 490, that there were reports of sexual abuse at one of his foster homes, ibid., that his mother had burned his handsas a child, ibid., that a Job Corps supervisor had made homosexual overtures towards him, id., at 490-491, and that Wiggins was "`borderline'" mentally retarded, id., at 491.[2] Schlaich explained that, although he was aware of all this potential mitigating evidence, he chose not to present it to the jury for a strategic reason—namely, that it would conflict with his efforts to persuade the jury that Wiggins was not a "principal" in Mrs. Lacs' murder (i.e. that he did not kill Lacs by his own hand). Id., at 504-505.
 
 
 87
 There are only two possible responses to this testimony that might salvage Wiggins' ineffective-assistance claim. The first would be to declare that Schlaich had an inescapable duty to hire a social worker to construct a socalled "social history" report, regardless of Schlaich's preexisting knowledge of Wiggins' background. Petitioner makes this suggestion, see Brief for Petitioner 32, n. 8 (asserting that it was "`a normative standard'" at the time of Wiggins' case for capital defense lawyers in Maryland to obtain a social history); and the Court flirts with accepting it, see ante, at 11 ("professional standards that prevailed in Maryland . . . at the time of Wiggins' trial" included, for defense of capital cases, "the preparation of a social history report"); ibid., at 11 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p. 133 (1989) (hereinafter ABA Guidelines),which says that counsel should make efforts "`to discover all reasonably available mitigating evidence'" (emphasis added by the Court)). To think that the requirement of a "social history" was part of "clearly established Federal law" (which is what §2254(d) requires) when the events here occurred would be absurd. Nothing in our clearly established precedents requires counsel to retain a social worker when he is already largely aware of his client's background. To the contrary, Strickland emphasizes that "[t]here are countless ways to provide effective assistance in any given case," 466 U. S., at 689, and further states that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides," id., at 688. Cf. ante, at 11 (treating the ABA Guidelines as "well-defined norms"). It is inconceivable that Schlaich, assuming he testified truthfully regarding his detailed knowledge of Wiggins' troubled childhood, App. 490-491, would need to hire a social worker to comport with Strickland's competence standards. And it certainly would not have been unreasonable for the Maryland Court of Appeals to conclude otherwise.
 
 
 88
 The second possible response to Schlaich's testimony about his extensive awareness of Wiggins' background is to assert that Schlaich lied. The Court assumes sub silentio throughout its opinion that Schlaich was not telling the truth when he testified that he knew of reports of sexual abuse in one of Wiggins' foster homes, see, e.g., ante, at 12 ("Had counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings"), and eventually declares straight-out that it disbelieves Schlaich, ante, at 19-20. This conclusion rests upon a blatant mischaracterization of the record, and an improper shifting of the burden of proof to the State to demonstrate Schlaich's awareness of Wiggins' background, rather than requiring Wiggins toprove Schlaich's ignorance of it. But, more importantly, it is simply not enough for the Court to conclude, ante, at 20, that it "cannot infer from Schlaich's postconviction testimony that counsel looked further than the PSI and DSS reports in investigating petitioner's background." If it is at least reasonable to believe Schlaich told the truth, then it could not have been unreasonable for the Maryland Court of Appeals to conclude that Wiggins' trial attorneys conducted an adequate investigation into his background. See 28 U. S. C. §2254(d)(1).
 
 
 89
 Schlaich's testimony must have been false, the Court insists, because the social services records do not contain any evidence of sexual abuse, and "[t]he questions put to Schlaich during his postconviction testimony all referred to what he knew from the social services records." Ante, at 18. That is not true. Schlaich was never asked "what he knew from the social services records." With regard to the alleged sexual abuse in particular, Schlaich answered " `[y]es' " to the following question: "`You also knew that where [sic] were reports of sexual abuse at one of his foster homes?'" This question did not "refe[r] to what [Schlaich] knew from the social services records," as the Court declares; and neither, by the way, did any of the other questions put to Schlaich regarding his knowledge of Wiggins' background. See App. 490-491. Wiggins' postconviction counsel simply never asked Schlaich to reveal the source of his knowledge.
 
 
 90
 Schlaich's most likely source of knowledge of the alleged sexual abuse was Wiggins himself; even Hans Selvog's extensive "social history" report unearthed no documentation or corroborating witnesses with respect to that claim. Id., at 464; see App. to Pet. for Cert. 177a, 193a. The Court, however, dismisses this possibility for two reasons. First, because " `the record contains no evidence that counsel ever pursued this line of questioning with Wiggins.'" Ante, at 19. This statement calls for a time-out to get ourbearings: The burden of proof here is on Wiggins to show that counsel made their decision without adequate knowledge. See Strickland, 466 U. S., at 687. And when counsel has testified, under oath, that he did have particular knowledge, the burden is not on counsel to show how he obtained it, but on Wiggins (if he wishes to impeach that testimony) to show that counsel could not have obtained it. Thus, the absence of evidence in the record as to whether or not Schlaich pursued this line of questioning with Wiggins dooms, rather than fortifies, Wiggins' ineffectiveassistance claim. Wiggins has produced no evidence that anything in Hans Selvog's "social history" report was unknown to Schlaich, and no evidence that any source on which Selvog relied was not used by Schlaich.
 
 
 91
 The Court's second reason for rejecting the possibility that Schlaich learned of the alleged sexual abuse from Wiggins is even more incomprehensible. The Court claims that "the phrase `other people's reports' [would] have been an unusual way for counsel to refer to conversations with his client." Ante, at 19. But Schlaich never used the phrase "other people's reports" in describing how he learned of the alleged sexual abuse in Wiggins' foster homes. Schlaich testified only that he learned of Wiggins' borderline mental retardation as it was reported in "other people's reports":
 
 
 92
 "`Q And you also knew that he was borderline mentally retarded?
 
 
 93
 "`A Yes.
 
 
 94
 "`Q You knew all—
 
 
 95
 "`A At least I knew that as it was reported in other people's reports, yes.
 
 
 96
 "`Q But you knew it?
 
 
 97
 "`A Yes.'" App. 490-491 (emphasis added).
 
 
 98
 It is clear that when Schlaich said, "`At least I knew thatas it was reported in other people's reports,'" Id., at 491 (emphasis added), the " `that' " to which he referred was the fact that Wiggins was borderline mentally retarded— not the other details of Wiggins' background which Schlaich had previously testified he knew.
 
 
 99
 The Court's final reason for disbelieving Schlaich's sworn testimony is his failure to mention the alleged sexual abuse in the proffer of mitigating evidence he would introduce if the trial court granted his motion to bifurcate. "Counsel's failure to include in the proffer the powerful evidence of repeated sexual abuse is . . . explicable only if we assume that counsel had no knowledge of the abuse." Ante, at 20. But because the only evidence of sexual abuse consisted of Wiggins' own assertions, see App. 464; App. to Pet. for Cert. 177a, 193a (evidence not exactly worthy of the Court's flattering description as "powerful"), there was nothing to proffer unless Schlaich declared an intent to put Wiggins on the stand. Given counsel's chosen trial strategy to prevent Wiggins from testifying during the sentencing proceedings, the decision not to mention sexual abuse in the proffer is perfectly consistent with counsel's claimed knowledge of the alleged abuse.
 
 
 100
 Of course these reasons the Court offers—which range from the incredible up to the feeble—are used only in support of the Court's conclusion that, in its independent judgment, Schlaich was lying. The Court does not even attempt to establish (as it must) that it was objectively unreasonable for the state court to believe Schlaich's testimony and therefore conclude that he conducted an adequate investigation of Wiggins' background. It could not possibly make this showing. Wiggins has not produced any direct evidence that his attorneys were uninformed with respect to anything in his background, and the Court can muster no circumstantial evidence beyond the powerfully unconvincing fact that Schlaich failed tomention the allegations of sexual abuse in his proffer. To make things worse, the Court is still bound (though one would not know it from the opinion) by the state court's factual determinations that Wiggins' trial counsel "did investigate and were aware of [Wiggins'] background," Wiggins, 352 Md., at 610, 724 A. 2d, at 16 (emphasis in original), and that "[c]ounsel were aware that [Wiggins] had a most unfortunate childhood," id., at 608, 724 A. 2d, at 15. See 28 U. S. C. §2254(e)(1).[3] Because it is at least reasonable to believe Schlaich's testimony, and because §2254(e)(1) requires us to respect the state court's factual determination that Wiggins' trial attorneys were aware of Wiggins' background, the Maryland Court of Appeals' legal conclusion—that trial counsel "did not have as detailed or graphic a history as was prepared by Mr. Selvog, but that is not a Constitutional deficiency," Wiggins, supra, at 610, 724 A. 2d, at 16 (emphasis added)—is unassailable under §2254(d)(1).
 
 B
 
 101
 The Court holds in the alternative that Wiggins has satisfied §2254(d)(2), which allows a habeas petitioner to escape §2254(d)'s bar to relief when the state court's adjudication of his claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," (emphasis added). This is so, the Court says, because the Maryland Court of Appeals wrongly claimed that Wiggins' social service records "recorded incidences of . . . sexual abuse." 352 Md., at 608-609, 724 A. 2d, at 15.
 
 
 102
 That it made that claim is true enough. And I will concede that Wiggins has rebutted the presumption of correctness by the "clear and convincing evidence" that §2254(e)(1) requires. It is both clear and convincing from reading the DSS records that they contain no evidence of sexual abuse. I will also assume, arguendo, that the state court's error was "unreasonable" in light of the evidence presented in the state-court proceeding.
 
 
 103
 Given all that, the Court's conclusion that a §2254(d)(2) case has been made out still suffers from the irreparable defect that the Maryland Court of Appeals' decision was not "based on" this mistaken factual determination. What difference did it make whether the social services records contained evidence of sexual abuse? Even if they did not, the court's decision would have been the same in light of Schlaich's sworn testimony that he was aware of the alleged sexual abuse. The source of Schlaich's knowledge —whether he obtained it from the DSS reports or from Wiggins himself—was of no consequence. The only thing that mattered was that Schlaich knew, and testified under oath that he knew, enough about Wiggins' background to make it reasonable to proceed without a report by a social worker. The Court's opinion does not even discuss this requirement of §2254(d)(2), that the unreasonable determination of facts be one on which the state-courtdecision was based.
 
 II
 
 104
 The Court's indefensible holding that Wiggins has avoided §2254(d)'s bar to relief is not alone enough to entitle Wiggins to habeas relief on his Sixth Amendment claim. Wiggins still must establish that he was "prejudiced" by his counsel's alleged "error." Strickland, 466 U. S., at 691-696. Specifically, Wiggins must demonstrate that, if his trial attorneys had retained a licensed social worker to assemble a "social history" of their client, there is a "reasonable probability" that (1) his attorneys would have chosen to present the social history evidence to the jury, and (2) upon hearing that evidence, the jury would have spared his life. The Court's analysis on these points continues its disregard for the record in a determined procession towards a seemingly preordained result.
 
 
 105
 There is no "reasonable probability" that a social-history investigation would have altered the chosen strategy of Wiggins' trial counsel. As noted earlier, Schlaich was well aware—without the benefit of a "social history" report— that Wiggins had a troubled childhood and background. And the Court remains bound, even after concluding that Wiggins has satisfied the standards of §§2254(d)(1) and (d)(2), by the state court's factual determination that Wiggins' trial attorneys "were aware of [Wiggins'] background," Wiggins, 352 Md., at 610, 724 A. 2d, at 16, and "were aware that Wiggins had a most unfortunate childhood," id., at 608, 724 A. 2d, at 15. See 28 U. S. C. §2254(e)(1). Wiggins' trial attorneys chose, however, not to present evidence of Wiggins' background to the jury because of their "deliberate, tactical decision to concentrate their effort at convincing the jury that appellant was not a principal in the killing of Ms. Lacs." Wiggins, supra, at 608, 724 A. 2d, at 15.
 
 
 106
 Wiggins has not shown that the incremental informationin Hans Selvog's social-history report would have induced counsel to change this course. Schlaich testified under oath that presenting the type of evidence in Selvog's report would have conflicted with his chosen defense strategy to raise doubts as to Wiggins' role as a principal, and that he wanted to avoid a "shotgun approach" with the jury. App. 504-505.[4] (This testimony is entirely unrefuted by the Court's statement that at the time of trial counsel "were not in a position to make a reasonable strategic choice," because of their alleged inadequate investigation, ante, at 23. Schlaich presented this testimony in state postconviction proceedings, when there was no doubt he was fully aware of the details of Wiggins' background. See App. 490-491.) It is irrelevant whether a hypothetical "reasonable attorney" might have introduced evidence of alleged sexual abuse, ante, at 19-20; Wiggins' attorneys would not have done so, and therefore Wiggins was not prejudiced by their allegedly inadequate investigation. There is simply nothing to show (and the Court does not even dare to assert) that there is a "reasonable probability" this evidence would have been introduced in this case. Ante, at 19-20.
 
 
 107
 What is more, almost all of Selvog's social-history evidence was inadmissible at the time of Wiggins' trial. Maryland law provides that evidence in a capital sentencing proceeding must be "reliable" to be admissible, see Whittlesey v. State, 340 Md. 30, 70, 665 A. 2d 223, 243 (1995), and many of the anecdotes regarding Wiggins'childhood consist of the baldest hearsay—statements that have been neither taken in court, nor given under oath, nor subjected to cross-examination, nor even submitted in the form of a signed affidavit. Consider, for example, the allegation that Wiggins' foster father sexually abused him "`two or three times a week, sometimes everyday,'" App. to Pet. for Cert. 177a. The only source of that information was Wiggins himself, in his unsworn and un-crossexamined interview with Hans Selvog. There is absolutely no documentation or corroboration of the claim, App. 464, and the allegedly abusive foster parent is apparently deceased. Id., at 470. Wiggins was, however, examined by a pediatrician during the time that this supposed biweekly or daily sexual abuse occurred, and the pediatrician's report mentioned no signs of sexual abuse. App. to Pet. for Cert. 181a; App. 464.
 
 
 108
 Much of the other "evidence" in Selvog's report (including Wiggins' claim that he was drugged by his Job Corps supervisor and raped while unconscious, and that he was raped by the teenage sons at his fourth foster home) was also undocumented and based entirely on Wiggins' say-so. The Court treats all this uncorroborated gossip as established fact,[5] ante, at 22—indeed, even refers to it as "powerful" evidence, ibid.—and assumes that Wiggins' lawyers could have simply handed Hans Selvog's report to the jury. Nothing could be further from the truth. As the State Circuit Court explained in rejecting Wiggins' SixthAmendment claim, "Selvog's report would have had a great deal of difficulty in getting into evidence in Maryland. He was not licensed in Maryland, the report contains multiple instances of hearsay, it contains many opinions in the nature of diagnosis of a medical nature." App. to Pet. for Cert. 156a.
 
 
 109
 The Court contends that Selvog's report "may have been admissible," ante, at 24—relying for that contention upon Whittlesey v. State, supra. Whittlesey, however, merely vacated the trial judge's decision that a social-history report assembled by Selvog was per se inadmissible on hearsay grounds and remanded for a determination of whether the hearsay evidence was "reliable." Id., at 71-72, 665 A. 2d, at 243. Thus, unless the Court is prepared to make the implausible contention that Wiggins' hearsay statements in Selvog's report are "reliable" under Maryland law, there is no basis for its conclusion that Maryland "considers this type of evidence at sentencing," ante, at 24. The State Circuit Court in the present case, in its decision that postdated Whittlesey, certainly did not think Selvog's report met the standard of reliability, App. to Pet. for Cert. 156a, and that court's assessment was undoubtedly correct. Wiggins' accounts of his background, as reported by Selvog, are the hearsay statements of a convicted murderer and, as the trial testimony in this case demonstrates, a serial liar. Wiggins lied to Geraldine Armstrong when he told her that Mrs. Lacs' car belongs to "`a buddy of min[e],'" App. 179. He lied when he told the police that he had obtained Mrs. Lacs' car and credit cards on Friday in the afternoon, rather than Thursday, id., at 180. He lied to Armstrong about how he obtained Mrs. Lacs' ring, ibid. And, knowing that the information he provided to Selvog would be used to attack his death sentence, Wiggins had every incentive to lie again about the supposed abuse he suffered. The hearsay statements in Selvog's report pertaining to the alleged sexual abuse were ofespecially dubious reliability; Maryland courts have consistently refused to allow hearsay evidence regarding alleged sexual abuse, except for statements provided by the victim to a treating physician. See Bohnert v. State, 312 Md. 266, 276, 539 A. 2d 657, 662 (1988) (refusing to admit into evidence a social worker's opinion, based on a child's "unsubstantiated averments," that the child had been sexually abused); Nixon v. State, 140 Md. App. 170, 178-188, 780 A. 2d 344, 349-354 (2001) (child protective services agent's testimony that retarded teenager told agent she had been sexually abused was inadmissible hearsay); Low v. State, 119 Md. App. 413, 424-426, 705 A. 2d 67, 73-74 (1998) (refusing to admit into evidence examining physician's testimony regarding a child's statements of sexual abuse).
 
 
 110
 Given that the anecdotes in Selvog's report were unreliable, and therefore inadmissible, the only way Wiggins' trial attorneys could have presented these allegations to the jury would have been to place Wiggins on the witness stand. Wiggins has not established (and the Court does not assert) any "reasonable probability" that they would have done this, given the dangers they saw in exposing their client to cross-examination over a wide range of issues. See App. 353 (Wiggins' trial attorneys advising him in open court: "`Kevin, if you do take the witness stand, you must answer any question that's asked of you. If it is a question the judge rules is a permissible question, you would have to answer'"). Their perception of those dangers must surely have been heightened by their observation of Wiggins' volatile and obnoxious behavior throughout the trial. See, e.g., id., at 32 (Wiggins interrupting the judge's statement of the verdict to say: "He can't tell me I did it. I'm going to go out.... I didn't do it. He can't tell me I did it"); id., at 56 (Wiggins interrupting the prosecutor's opening argument to say: " `I'm not going to take that because I didn't kill that lady. I'm not goingto sit there and take that'").
 
 
 111
 But even indulging, for the sake of argument, the Court's belief that Selvog's report "may" have been admissible, ante, at 24, the Court's prejudice discussion simply assumes without analysis that the sentencing jury would have believed the report's hearsay accounts of Wiggins' statements. Ante, at 24-25. Yet that same jury would have learned during the guilt phase of the trial that Wiggins is a proven liar, see App. 179-180, and Wiggins would not have aided his credibility with the jury by avoiding the witness stand and funneling his story through a social worker. I doubt very much that Wiggins' jury would have shared the Court's uncritical and wholesale acceptance of these hearsay claims.
 
 
 112
 * * *
 
 
 113
 Today's decision is extraordinary—even for our "death is different" jurisprudence. See Simmons v. South Carolina, 512 U. S. 154, 185 (1994) (SCALIA, J., dissenting). It fails to give effect to §2254(e)(1)'s requirement that state court factual determinations be presumed correct, and disbelieves the sworn testimony of a member of the bar while treating hearsay accounts of statements of a convicted murderer as established fact. I dissent.
 
 
 
 Notes:
 
 
 [1]
 28 U. S. C. §2254(e)(1) provides:
 "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."
 
 
 [2]
 The only incident contained in the "social history" report about which Schlaich did not confirm knowledge was the occurrence of sexual abuse inmore than one of Wiggins' foster homes. And that knowledge remained unconfirmed only because the question posed asked him whether he knew of reports of abuse at " `one' " of the foster homes. App. 490. The record does not show that Schlaich knew of all these incidents in the degree of detail contained in the "social history" report —but it does not show that he did not, either. In short, given Schlaich's testimony there is no basis for finding that he was without knowledge of anything in the "social history" report.
 
 
 [3]
 The Court defends its refusal to adhere to these state-court factual determinations on the ground that "the Maryland Court of Appeals' conclusion that thescope of counsel's investigation . . . met the legal standards set forth in Strickland represented an objectively unreasonable application of our precedent." Ante, at 16. That is an inadequate response, for several reasons. First, because in the very course of determining what was the scope of counsel's investigation the Court was bound to accept (as it did not) the Maryland Court of Appeals' factual findings that counsel knew of Wiggins' background, including his "most unfortunate childhood." And it is an inadequate response, secondly, because even after the Court concludes that the petitioner has avoided §2254(d)'s bar to relief because of that misapplication of Strickland (or because of the alleged mistaken factual assumption "that counsel learned of . . . sexual abuse . . . from the DSS records," ante, at 15-16), it still must observe §2254(e)(1)'s presumption of correctness in deciding the merits of the habeas question. See Miller-El v. Cockrell, 537 U. S. 322, 341, 348 (2003).
 
 
 [4]
 Introducing evidence that Wiggins suffered semiweekly (or perhaps daily) sexual abuse as a child, for example, could have led the jury to conclude that this horrible experience made Wiggins precisely the type of person who could perpetrate this bizarre crime—in which a 77-year-old woman was found drowned in the bathtub of her apartment, clothed but missing her underwear, and sprayed with Black Flag Ant and Roach Killer
 
 
 [5]
 Wiggins' postconviction lawyers could have increased the credibility of these anecdotes, and assisted this Court's prejudice determination, by at least having Wiggins testify under oath in the state postconviction proceedings as to his allegedly abusive childhood. They did not do that—perhaps anticipating, correctly alas, that they could succeed in getting this Court to vacate a jury verdict of death on the basis of rumor and innuendo in a "social history" report that would never be admissible in a court of law