IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 4, 2003

## MICHAEL PITTMAN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26210     James C. Beasley, Jr., Judge**

_____

**No. W2002-02752-CCA-R3-PC  - Filed December 19, 2003**

_____

The petitioner, Michael Pittman, appeals the denial of his post-conviction relief petition after his conviction for aggravated robbery.  On appeal, the petitioner contends he received ineffective assistance of counsel at trial.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Joshua B. Spickler, Memphis, Tennessee, for the appellant, Michael Pittman.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In January 2000, a Shelby County jury convicted the petitioner of aggravated robbery, and the trial court sentenced him to twenty years as a Range II multiple offender.  This court affirmed his conviction on direct appeal.  *See* State v. Michael Pittman, No. W2000-01027-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 411, at **1-2 (Tenn. Crim. App. May 31, 2001, at Jackson).  The petitioner subsequently filed a petition for post-conviction relief alleging he received ineffective assistance of counsel at trial.  At the conclusion of the hearing, the post-conviction court denied the petition.

### I.  TRIAL PROCEEDINGS

The facts presented at the petitioner's trial for aggravated robbery were as follows:

At trial, Corey Miller testified that around 1:30 or 2:00 a.m. on December 22, 1998, he stopped at an Amoco gas station in Memphis, Tennessee to purchase

gasoline. He went to the clerk's window to pay for his gasoline, and a white Chevrolet pulled up to the pumps near his car. Mr. Miller testified that the driver of the white Chevrolet got out of the car and asked him about the gold rims he had on his car. The man asserted that the rims on Mr. Miller's car belonged to him, but Mr. Miller told the man that he had ordered the rims from California. The man then went back to his car and drove around to the other side of the gas station. At that point, another man got out of the white Chevrolet, walked to the clerk's window, and told Mr. Miller that the rims belonged to the driver. That man, whom Mr. Miller identified as the Defendant, pulled out a gun and demanded Mr. Miller's keys. Mr. Miller testified that he told the Defendant that the car was already running. Due to a "worn-down" key, Mr. Miller was able to leave the car running but still remove the key from the ignition and lock the door. The Defendant then demanded that Mr. Miller unlock the door, which Mr. Miller did. The Defendant drove away in Mr. Miller's car, but did not take Mr. Miller's keys.

When the police arrived, Mr. Miller gave them a description of the two men in the white Chevrolet and the gun used by the Defendant. He described the gun as "a steel gray 9mm Ruger or a .45." During trial, Mr. Miller identified a gun as being similar to the one possessed by the Defendant that night. Mr. Miller testified that after talking to the police, his mother came to pick him up at the gas station with Mr. Miller's girlfriend and his girlfriend's sister's boyfriend. They started driving around looking for signs of the stolen car. After pulling out of an apartment complex nearby, Mr. Miller spotted the white Chevrolet in which the Defendant had been riding before he took Mr. Miller's car. Mr. Miller said that he called "911" on the cellular phone, and his mother started following the car. The police arrived and stopped the car, and the Defendant and a different driver emerged from the car. Mr. Miller identified the Defendant on the scene as the person who had taken his car at gun-point, but he could not identify the driver. Mr. Miller testified that his tool box and his two "kick boxes" were located in the white Chevrolet. He identified pictures of this property, which had been taken by the Defendant when the Defendant drove away in his car.

Stacie Tate, the clerk who was working at the Amoco gas station, testified that she had known Mr. Miller for approximately seventeen years, though they had not seen each other in a long time. She said that she was talking to Mr. Miller when she saw a man get out of a white car on the other side of the building. As Ms. Tate was helping another customer, she saw the man approach Mr. Miller and start talking to him about some gold rims. She then saw the man pull a gun on Mr. Miller, put the gun to Mr. Miller's side, and tell Mr. Miller to walk to the car because he wanted the keys to the car. The man drove away in Mr. Miller's car. She said that the man had a silver gun that "was the type of gun that the policemen carry." She identified a gun at trial that looked like the gun she saw that night. Ms. Tate also identified the Defendant as the person she saw pull a gun on Mr. Miller that evening and drive away in Mr. Miller's car. She further testified that she identified a picture of the Defendant as the person there that night when she was shown a photographic lineup

-2-

by an investigator with the district attorney's office. On cross-examination, Ms. Tate admitted that she had been told by someone from the district attorney's office where the Defendant would be sitting in the courtroom and that she only looked at that spot when she was asked whether she could identify the man she saw that night; notwithstanding, she asserted that her in-court identification was not based on the information she received about where the Defendant would be sitting. Ms. Tate clarified that she had asked prior to trial where the parties would be sitting because she was not familiar with courtrooms.

Joe Owen, a Memphis police officer, testified that he stopped a vehicle in which the Defendant was riding on December 22, 1998, in response to a radio broadcast. At the scene, Mr. Miller identified the Defendant as the person who had robbed him of his car. A search of the vehicle revealed a Ruger semi-automatic pistol, which was recovered between the cushions of the driver's seat.

Bryant Jennings, a crime scene officer with the Memphis Police Department, testified that he tagged the weapon and its magazine recovered by Officer Owen. The magazine had five live rounds in it. Neither the weapon nor the magazine was checked for fingerprints. . . . The weapon seized from the vehicle was introduced into evidence.

Sergeant Joseph Scott was assigned as the primary lead investigator in this case. He testified that he interviewed the Defendant on the morning of December 23, 1998. During the interview, the Defendant stated that he did take a car from someone at the Amoco station but that he did not have a gun. The Defendant asserted that he was with some other people and that the other people told him the rims on Mr. Miller's car had been stolen from them. According to Sergeant Scott, the Defendant stated that these other people threatened him with harm if he did not take the car. However, the Defendant would not provide Sergeant Scott with information identifying the people.

Michael Pittman, 2001 Tenn. Crim. App. LEXIS 411, at **2-7.

## II. POST-CONVICTION RELIEF HEARING

The petitioner testified two attorneys represented him at trial. He stated that prior to trial, defense counsel met with him on one occasion at the jail and on four or five occasions at the courthouse during various pre-trial hearings. He further stated he and defense counsel discussed the state's evidence, which included his statement to the police and the potential testimony of the victim and the cashier, both of whom identified him as the perpetrator.

The petitioner testified that although he took the victim's vehicle, he did not possess a weapon and was, thus, not guilty of aggravated robbery. He maintained he was coerced into committing the offense by "Six-Nine," a gang member. According to the petitioner, "Six-Nine" drove him to the convenience store, exited the vehicle, and approached the victim with a gun while

the petitioner remained inside the vehicle. The petitioner then exited the vehicle, entered the victim's vehicle, and drove away from the premises. The petitioner later left the vehicle with "Six-Nine" and Derrick Smith and returned to his residence. He stated Smith then drove to the petitioner's residence in the stolen vehicle in order to drive the petitioner to his girlfriend's residence. While en route, the police stopped the vehicle and, upon searching the vehicle, discovered a gun. The petitioner maintained the firearm belonged to Smith, and he was unaware that Smith possessed the weapon.

The petitioner testified he requested defense counsel interview "Six-Nine" and provided them with his contact information. The petitioner stated he wanted defense counsel to present evidence that he did not possess a weapon when he committed the offense, and "Six-Nine" would have testified that the petitioner did not possess a firearm. The petitioner further stated that a short time after providing defense counsel with this information, lead counsel told him that she was unable to locate "Six-Nine." According to the petitioner, by the time defense counsel attempted to locate "Six-Nine," he had moved, and the petitioner did not know his new address. The petitioner stated he also requested defense counsel interview Derrick Smith and provided them with his contact information; however, they failed to locate Smith.

The petitioner stated he also asked defense counsel to have the gun recovered by the police tested for fingerprints. He said that although defense counsel informed him that the gun had been tested for fingerprints, counsel did not reveal the results. The petitioner stated someone later told him that his fingerprints were not on the weapon.

The petitioner testified defense counsel relayed a ten-year plea offer to him prior to trial. He further stated defense counsel instructed him to reject the offer because he could possibly be convicted of a lesser offense at trial; thus, he rejected the offer based upon defense counsel's advice. He explained he understood the risks of a trial and it was his decision to go to trial, "thanks to [defense counsel]."

The petitioner conceded his statement to the police, which was consistent with his version of the events, was read into evidence during trial. The petitioner stated defense counsel advised him against testifying at trial because, if he chose to do so, the jury would hear information regarding his prior convictions. The petitioner stated he decided not to testify based upon defense counsel's advice.

Lead counsel, who was an assistant public defender, testified she met with the petitioner on two occasions at jail and on five occasions during various court hearings. She also had several telephone conversations with the petitioner. Lead counsel testified she and the petitioner discussed discovery materials and any possible defenses. She stated the petitioner provided her with three different versions of the events, two of which he later stated were false.

Lead counsel testified the petitioner provided her with contact information for "Six-Nine." Lead counsel stated she filed an investigation request with her investigator and asked the investigator to discover the identity of "Six-Nine." Lead counsel testified she learned that "Six-Nine's" name was LaKeith Hampton. The petitioner provided lead counsel with the address and telephone number of Pearl Hampton, LaKeith's mother. However, by the time lead counsel received the information, Ms.

-4-

Hampton had moved. When the investigator located Ms. Hampton, she denied knowing LaKeith. Lead counsel testified that after months of attempting to locate LaKeith, the petitioner informed her that his brother had spoken to LaKeith, who stated he did not want to testify for fear that he would be arrested due to his involvement in the offense. Lead counsel stated that from April 1999 until January 2000, she and her investigator unsuccessfully attempted to locate LaKeith and diligently pursued all contact information provided by the petitioner.

Lead counsel stated the petitioner maintained that although he took the victim's vehicle, he did not possess a weapon while committing the offense. The petitioner told lead counsel that he was unable to recall who drove him to the convenience store where he then took the victim's vehicle.

Lead counsel testified the petitioner asked her to interview Derrick Smith, who was driving the vehicle in which the petitioner was arrested. Lead counsel stated that although the petitioner provided an address in which he stated Smith could be contacted, her investigator was unable to locate Smith.

Lead counsel testified she asked the prosecutor whether the gun seized by the police had been tested for fingerprints. The prosecutor informed lead counsel that the result of the test was "[n]egative for being able to recover prints." Lead counsel then stated there were "[p]rints of no value." Lead counsel testified she did not order an independent test.

Lead counsel testified the state presented two separate plea offers, and she discussed both offers with the petitioner. The state first presented a twelve-year plea offer. The second offer was a "one-day-only" offer for ten years to be served as a Range I offender. The petitioner rejected the offers and went to trial.

Lead counsel stated that because the petitioner maintained he did not possess a weapon during the commission of the offense, he wanted to plead guilty to theft. Lead counsel informed the petitioner that the state would not offer a plea to a lesser charge due to allegations that a gun was involved and a gun was recovered from the vehicle in which the petitioner was arrested. Lead counsel further informed the petitioner that the state intended to present two eyewitnesses who would identify him as the person who possessed the gun. Lead counsel testified she and the petitioner discussed his right to a jury trial and his option of pleading guilty. Lead counsel testified the petitioner made the decision to proceed to trial.

### III. POST-CONVICTION COURT'S FINDINGS

In denying the petitioner's post-conviction relief petition, the post-conviction court found lead counsel and her investigator conducted an "extensive" investigation in an effort to locate LaKeith Hampton and discuss his testimony with him. The court noted the petitioner provided lead counsel with the name "Six-Nine" and general contact information, and lead counsel utilized this information but was unsuccessful. The court further noted that after lead counsel and her investigator made an "extensive" effort to locate Hampton, the petitioner informed lead counsel that his brother had spoken to Hampton, who stated he was afraid to testify. The court also noted that

had Hampton coerced the petitioner into committing the robbery as the petitioner alleged, it would seem "odd" that Hampton would willingly testify to these events under oath.

The post-conviction court found lead counsel and her investigator made "extensive" efforts to locate Derrick Smith but were unsuccessful. The court found lead counsel did not do "anything less than what would be expected of a competent trial counsel in trying to locate these witnesses and bring them forward." The post-conviction court noted the petitioner did not present any proof other than his allegations indicating Smith and Hampton would present testimony contrary to the evidence introduced at trial.

The post-conviction court found the petitioner failed to establish that he received ineffective assistance of counsel due to lead counsel's failure to secure an independent fingerprint analysis of the gun. It noted the gun had been dusted for fingerprints, and the fingerprints were "of no value." The court found that

> since the gun had already been dusted and tested for prints and they were not the defendant's and I assume that information came out at the trial, I haven't read the trial transcript, but it would seem to the court that defense counsel was not negligent in failing to request that the gun be dusted for prints since that had already been done and they were not the defendant's.

It further found that even if lead counsel had requested an independent fingerprint analysis, the result of the analysis would not have affected the verdict due to the fact that two eyewitnesses identified the petitioner as the person who possessed a weapon regardless of whether the gun recovered by the police was the actual gun used in the commission of the robbery.

Finally, the post-conviction court found the petitioner failed to establish he received ineffective assistance of counsel with regard to the plea negotiations. The court further found the state made a twelve-year offer and a ten-year offer, and the petitioner rejected both offers.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends he received ineffective assistance of counsel at trial. Specifically, he asserts lead counsel was ineffective in failing to investigate and interview witnesses, in failing to present proof at trial regarding the results of a fingerprint analysis of the gun, and in encouraging him to reject the plea offer and proceed with trial. We disagree with the petitioner's contentions.

### A. Standard

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show (1) that counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. *See* Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of

competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, we assess performance by eliminating the distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time. Wiggins v. Smith, ___ U.S. ___, ___, 123 S. Ct. 2527, 2536, 156 L. Ed. 2d 471 (2003); Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068) (citations omitted).

The petitioner bears the burden of proving the factual allegations that would entitle the petitioner to relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) 2003). We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. Burns, 6 S.W.3d at 461. However, the post-conviction court's conclusions of law – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a *de novo* standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001) (citations omitted).

## B. Failure to Investigate and Interview Witnesses

The petitioner maintains lead counsel failed to investigate and present evidence that he did not possess a weapon during the commission of the offense. Specifically, he asserts lead counsel was ineffective in failing to interview Derrick Smith and LaKeith "Six-Nine" Hampton, whom the petitioner alleges would have provided proof that he did not possess a weapon.

"When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); *see also* Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. Black, 794 S.W.2d at 757. We note that the petitioner failed to present Smith and Hampton as witnesses at the post-conviction relief hearing. Therefore, we are unable to determine whether they were material witnesses, whether lead counsel was deficient in failing to interview them, and whether the failure to interview them prejudiced the petitioner.

Furthermore, the post-conviction court found lead counsel and her investigator made "extensive" efforts to locate both Smith and Hampton. The evidence does not preponderate against the findings of the post-conviction court. Accordingly, we conclude the petitioner has failed to establish counsel was deficient and has further failed to establish prejudice.

## C. Failure to Present Proof of Fingerprint Analysis

The petitioner next contends lead counsel was ineffective in failing to present evidence at trial regarding the results of the fingerprint analysis on the gun. He maintains the results of the fingerprint analysis were "negative as to [the petitioner]," and this evidence would have strengthened his position that he did not possess a weapon. However, we note that in his amended post-conviction relief petition, the petitioner only asserted lead counsel was ineffective in failing to order an independent fingerprint analysis of the gun, and the post-conviction court made findings based upon this contention. Since an appellant cannot change theories from the trial court to the appellate court, this issue is waived. State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001); State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000).

Regardless of waiver, we conclude the petitioner failed to establish lead counsel was deficient in failing to present proof at trial regarding the results of the fingerprint analysis on the gun. During the post-conviction relief hearing, lead counsel testified that upon speaking to the prosecutor, she learned the gun had been dusted for fingerprints and that the result of the test was "[n]egative for being able to recover prints." Lead counsel then stated there were "[p]rints of no value." The post-conviction court found a fingerprint analysis had been conducted, and the fingerprints were "of no value." The court later noted the prints "were not the defendant's."

We are in a quandary regarding the fingerprint analysis. We are unable to determine from the record whether any fingerprints were actually found on the gun; whether fingerprints were recovered but could not be identified; or whether fingerprints belonging to someone other than the petitioner were identified. The petitioner has failed to establish that lead counsel was ineffective in failing to present this evidence at trial.

We further conclude the petitioner failed to establish lead counsel was ineffective in failing to secure an independent fingerprint analysis of the gun. No proof was offered at the post-conviction hearing as to what the results would have been had the independent analysis been conducted. Accordingly, this issue is without merit.

## D. Encouraging the Petitioner to Proceed with Trial

Finally, the petitioner contends lead counsel was ineffective in encouraging him to proceed to trial rather than accept the state's plea offer. He asserts that despite the state's "significant evidence," lead counsel informed him that he had a "good chance" at trial.

The post-conviction court found the petitioner wanted either a plea offer addressing his contention that he did not possess a weapon or a trial. The state made a twelve-year offer and a ten-year offer, both of which the petitioner rejected. Lead counsel testified she informed the petitioner of the state's evidence against him and stated the petitioner made the decision to proceed with trial. The petitioner testified he understood the risks of going to trial. We conclude the petitioner failed to establish lead counsel encouraged him to reject the plea offers and proceed with trial. This issue is without merit.

We affirm the judgment of the post-conviction court.

                                        _____

                                        JOE G. RILEY, JUDGE