Opinion issued July 27, 2006


















In The
Court of Appeals
For The
First District of Texas




NO. 01-05-00597-CR
NO. 01-05-00598-CR
NO. 01-05-00599-CR
___________

DENNIS WRIGHT, Appellant

V.

THE STATE OF TEXAS, Appellee



 
On Appeal from the 240th Judicial District Court of
Fort Bend County, Texas
Trial Court No.’s 38010A, 40922, 40923

 
 
O P I N I O N
          A jury found appellant, Dennis Wright, guilty of the offenses of indecency with
a child by exposure,


 indecency with a child by contact,


 and aggravated sexual
assault of a child.


 The jury assessed appellant’s punishment at confinement for ten
years in the exposure case, twenty years in the contact case, and life in the sexual
assault case, with the sentences to run consecutively.


 In two issues, appellant
contends that he was denied his Sixth Amendment


 right to effective assistance of
counsel based on his trial counsel’s failure to investigate and use an expert to present
a defense and assist in the cross-examination of adverse witnesses.
          We reverse and remand to the trial court for proceedings consistent with this
opinion.Factual and Procedural Background
          On April 23, 2003, a Fort Bend County Grand Jury issued a true bill of
indictment, accusing appellant of the offense of indecency with a child by exposure. 
The State alleged that appellant had knowingly allowed his daughter, the six year-old
complainant, to watch him masturbate. On October 9, 2003, the complainant began
seeing Matthew Spears, a therapist. During the course of the sessions with Spears,
the complainant made additional outcries that appellant had allowed her to “help” him
masturbate


 and had penetrated her sexual organ with his sexual organ.


 On October
11, 2004, another Fort Bend County Grand Jury issued another true bill of indictment,
accusing appellant of the additional offenses of indecency with a child by contact and
aggravated sexual assault of a child.
          Carla Fair-Wright, the complainant’s mother, testified that, in March 2001, she
and appellant divorced after nine years of marriage. Fair-Wright explained that she
and appellant agreed on a visitation schedule in which their two children visited
appellant every other weekend and every Tuesday. On these occasions, both children
 would “usually spend the night at appellant’s apartment,” but on some occasions, the
complainant would go to visit appellant alone. 
           Fair-Wright further testified that, on March 23, 2003, approximately one week
after a scheduled visitation, while giving the complainant a bath at their home, the
complainant told her that appellant “had to get the milk out, or he can’t get the milk
out.” Fair-Wright explained that “[t]hen, [the complainant] demonstrated to [her]
how he does that.” Fair-Wright observed the complainant gesture back and forth with
her hands in her groin area, and she understood the complainant to be telling her that
appellant had masturbated in front of her. Following this exchange with the
complainant, Fair-Wright called Child Protective Services (“CPS”) and set up an
appointment for both children. Fair-Wright also explained that, after the complainant
began seeing Spears, and while the indecency with a child by exposure case was
pending against appellant, the complainant gave her additional information about
what had occurred at appellant’s apartment on one other occasion where she “talked
a little bit more about her father asking her to help.” Fair-Wright then informed
Spears, as well as Fort Bend County Assistant District Attorney Mike Hartman of this
second outcry.


 
          On cross-examination, Fair-Wright testified that, prior to the allegations of
indecency and sexual abuse, she had filed for divorce and pursued custody of the
children; however, she denied telling the judge in the divorce proceeding that she
wanted to move out of the country with the children. She agreed that the complainant
had some previous behavioral problems starting in first grade, including one incident
where she had taken a knife to school. The complainant’s school had also called Fair-Wright on another occasion because the complainant “was acting in a very sexual
manner” by “bumping up against [a] boy.” Fair-Wright denied feeling any anger or
bitterness toward appellant because of their divorce.
          Christine Thomas, a former CPS investigator, testified that she observed the
complainant’s videotaped interview at the Children’s Assessment Center (“CAC”).


 
During this interview, the complainant told investigators that she had “seen her dad’s
penis with ‘milk’ all over it and observed her dad rubbing it.” The complainant told
investigators that when she asked her dad what he was doing, he became pale and told
her that he did not want anyone to know because they “would make fun of him.” 
Thomas believed the complainant’s statements during the interview were “very clear
and very age-appropriate.” 
          Thomas further testified that she had interviewed appellant regarding the
allegations. Thomas described appellant’s behavior during the interview as “very
evasive.” She explained that, after initially denying the allegations, “[appellant] said
exactly that [the complainant] had seen him once.” Thomas also stated that appellant
“admit[ted] to saying that he had told her something about it was called Daddy’s
milk.” 
          The complainant, who was eight years old at the time of trial, testified that
appellant, her father, had stopped living at home with her, her mother, and her
brother. After her parent’s separation, the complainant and her brother would visit
and spend the night with appellant at his new apartment. These visitations stopped
after the complainant revealed to her mother that, during many of these visits, she had
seen appellant’s sexual organ. The complainant had seen appellant’s hands “on his
pennis [sic]” and a “thick white liquid” or “milk” come out.


 She further testified
that she touched appellant’s penis with her hands during “a lot” of her visits to
appellant’s apartment. She also described being on top of appellant and contacting
appellant’s sexual organ with her sexual organ, an activity that she called “humping.”
          On cross-examination, when asked whether certain people had “coached [her]
on the answers and asked [her] the questions already,” the complainant answered,
“Yes.” When asked to identify those people, the complainant named Suzy Morton,
the prosecutor trying the case, as well as her therapist, Spears. However, she denied
that her mother had been one of those people.
          Appellant presented the testimony of three witnesses—a security guard from
appellant’s place of employment, the complainant’s brother, and appellant. The
security guard, Thu Martinez, testified that, according to an attendance log, appellant
had signed into work for everyday of March 2003, excepting only the 18th, 19th, and
20th. On cross-examination, Martinez conceded that there were no times on the
attendance log and he had no idea when or how long appellant had worked on any
given day.
          The complainant’s brother, who was twelve years old at the time of trial,
testified that, after his parents separated, he visited appellant alone and with his sister,
but that his sister had never visited appellant without him. When asked whether he
“[knew] of any instances where [the complainant] has lied or made up things,” the
complainant’s brother answered, “She lies a lot, you know.” He explained that there
were “lies like, ‘I have like $5,000’ and stuff like that. That kind of lie, you know,
like silly lies.”
          Appellant testified that he and Fair-Wright divorced in March of 2001, and the
divorce “was very acrimonious.” Appellant explained that a dispute had arisen
regarding custody of the children, and he believed that the charges against him were
the result of this dispute. Appellant further testified that, in his opinion, the
complainant’s testimony consisted of “very well-coached statements.” He denied
having any sexual contact with the complainant or having the complainant watch him
masturbate.
          After the jury found appellant guilty and assessed his punishment, the trial
court, on June 1, 2005, held a hearing on appellant’s motion for new trial. At the
hearing, Bernard Sacks, appellant’s trial counsel, testified that he had limited access
to the State’s file prior to trial. Specifically, Sacks explained that he had not received
Spears’s notes from the complainant’s therapy sessions. He testified that the first
time he had seen a copy of the handwritten notes from Spears “was approximately a
week or two before the trial” and that the first time he received a copy of the notes
was “after the jury was impaneled and we were in the courtroom.” When asked
during the motion for new trial why he did not contact an expert witness, Sacks
stated:
I did not [contact an expert] because I was told . . . I could not have the
child interviewed and when I received [Spears’s] notes, . . . it was the
night before we started putting on testimony, so I had not time to take
that to an expert. 

Sacks added that, although he was aware of literature about child memory and
fabrication of charges, he did not have time to obtain the assistance of an expert to
help prepare such a defense. Sacks further testified that he had not tried an
aggravated sexual assault of a child case prior to the instant case. 
          Spears’s notes, which were introduced into evidence at the hearing, contain his
record of the complainant’s therapy sessions from the months following the
complainant’s initial outcry of indecent exposure through the time that the second
Fort Bend County Grand Jury issued the second indictment accusing appellant of the
more serious offenses of indecency by contact and sexual assault. The notes indicate
that Fair-Wright was actually present during most of the sessions. In his initial
“Behavioral Health Assessment” of the complainant, dated October 15, 2003, Spears
wrote “Dad masturbated in bed while [the complainant] was lying next to him. 
Possibility he had [the complainant] masturbate him as well.” (emphasis added). 
Thus, Spears’s notes demonstrate that, from the outset, Spears suspected that
appellant had involved the complainant in masturbation. This assessment was made
nearly seven months prior to the complainant’s May 19, 2004 outcry in which she
stated that her father “asked her to help” him masturbate. In his notes of a March 30,
2004 therapy session, Spears reports, “[the complainant] said that the court won’t let
her see her dad because her mom is making them say that.” 
          One month later, in an April 27, 2004 session, Spears reports, “[the
complainant] stated that her dad would pull his pants down and then make the ‘milk’
come out when he thought she was sleeping. She said he never asked her to help him
‘get the milk out.’ . . . She also said it was her fault for waking up.” But in her very
next session, on May 19, 2004, Spears’s notes indicate that the complainant told him
that appellant had the complainant “help” him masturbate and that it started when she
was six years old. 
          Spears’s notes also show that he met with assistant district attorney Mark
Hartman to discuss the complainant’s subsequent outcries


 and that, on February 3,
2005, Suzy Morton, the lead prosecutor in the case, was present and participated in
one of the complainant’s therapy sessions. Spears’s notes for the February 3rd
session indicate that “[the] session was intended to give the complainant a chance to
meet Ms. Morton and introduce her to the idea of having to tell her story again.” 
          On cross-examination, Sacks conceded that he was never denied access to the
State’s file and that he was aware of Spears’s existence and contact information at
least thirty days prior to trial. However, he explained that, when he had first received
Spears’s notes, he had “great difficulty reading those.” When asked why he did not
ask for a continuance on the date of trial, Sacks stated “I didn’t believe that [Spears’s
notes] . . . was [sic] discovery as such, because . . . it’s very difficult to read.” Sacks
also stated that he believed that the trial court had ordered the State to provide him
an expert report thirty days in advance of trial and that Spears would provide such a
report.
          Dr. Jerome Brown, a licensed psychologist, testified that he was very familiar
with literature regarding false allegations of sexual abuse. Brown explained that his
research found that custody disputes generate a high proportion of false allegations
of sexual abuse. In his review of the complainant’s statements and Spears’s interview
notes, Brown noticed an “extreme variation from the standard protocol of working
with a child victim; and the particular variances from that protocol suggested that
there was a very high potential for significant adverse influences upon the child that
might have created . . . a coercive environment in which she would be encouraged and
pressured in various ways to make false allegations.” 
          Brown noted that in the videotaped CPS interview of the complainant, the child
initially told the interviewer that her father, appellant, did not know that she was
watching him masturbate; however, “the interviewer ignored the child’s statement or
otherwise did not pursue it at all.” Brown also stated that Fair-Wright’s participation
in the therapy sessions, as reflected by Spears’s notes, would not allow the
complainant an opportunity to alter any dynamic occurring between the child and the
mother that could encourage the child to make a false statement. Brown added that
Spears’s notes demonstrated “a significant violation of professional boundaries” by
the State’s participation in therapy sessions. In Brown’s opinion, based on his review
of the initial CPS interview of the child and Spears’s notes, the investigation of the
case and the treatment of the child was not impartial.
          Brown opined that a properly qualified expert would have been able to assist
appellant’s trial attorney in preparing a cross-examination that would clarify whether
or not Spears’s “improper methodology,” and any other adverse influences, would
influence the complainant to make false statements. Brown also stated that an expert
could have assisted in preparing for the cross-examination of the complainant and
mother by providing an understanding of the dynamics of the custody battle between
parents and explaining the dynamics between the father, daughter, and mother.Ineffective Assistance of Counsel
          In his two issues, appellant contends that he was denied effective assistance of
counsel when his trial counsel did not investigate his case or use an expert to present
a defense and assist in the cross-examination of adverse witnesses. He asserts that
an expert would have explained the improper impact that Spears’s therapy may have
had on the complainant and aided in the cross-examination of the complainant and
Fair-Wright. 
          The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984). Strickland requires a two-step analysis whereby appellant must show
that (1) counsel’s performance fell below an objective standard of reasonableness,
and (2) but for counsel’s unprofessional error, there is a reasonable probability that
the result of the proceedings would have been different. 466 U.S. at 687, 104 S. Ct.
at 2064; Vasquez v. State, 830 S.W.2d 948, 949 (Tex. Crim. App. 1992). Strickland
defines reasonable probability as a “probability sufficient to undermine confidence
in the outcome.” 466 U.S. at 694, 104 S. Ct. at 2068. It is appellant’s burden to
prove ineffective assistance and he must overcome the strong presumption that, under
the circumstances, the challenged action might be considered sound trial strategy. 
Gamble v. State, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). 
A reviewing court determines the reasonableness of counsel’s challenged conduct in
context and views it as of the time of counsel’s conduct. Andrews v. State, 159
S.W.3d 98, 101 (Tex. Crim. App. 2005). In reviewing counsel’s performance, we
look to the totality of the representation to determine the effectiveness of counsel,
indulging a strong presumption that his performance falls within the wide range of
reasonable professional assistance or trial strategy. Thompson v. State, 9 S.W.3d 808,
813 (Tex. Crim. App. 1999). A claim of ineffective assistance must be firmly
supported in the record. Id. 
          Here, appellant complains that although Sacks’s theory was that the allegations
were false and were the result of acrimony that resulted from appellant’s divorce, he
did not introduce any evidence other than appellant’s own testimony that his ex-wife
was upset with him to support his theory of defense and refute the allegations. 
          As noted, Sacks stated that he had seen, in the State’s file, Spears’s notes from
the therapy sessions “about a week” before trial, but he had great difficulty reading
them and thought that Spears would have written a report with his findings prior to
trial. Sacks “did not have an opportunity to review [Spears’s notes] or have them
reviewed by an expert to see if there might be evidence that would support [the]
defense of fabrication.” Thus, the record reveals that, at the time of appellant’s trial,
Sacks remained unaware of the contents of Spears’s notes. Sacks also conceded that
he knew, well in advance of trial, about the existence of Spears and was able to
contact him. Sacks reiterated that he had great difficulty reading Spears’s notes and
“chose to wait for a report from him. Not handwritten notes, . . . but to have a
medical—or have an official report that’s signed by him, . . . signed by his supervisor
. . . that said he met with the child, that this was his conclusions.” He further testified
that even if Spears’s notes had been in the State’s file in January 2005, when the State
filed its outcry notice, he wouldn’t have been able to read them. He added that
“[t]here were no conclusions on there, and not being an expert, I would have thought
that Mr. Spears would have written a report with his findings, . . . determining if the
child was telling the truth or not telling the truth.” With respect to the complainant’s
videotaped interview at the CAC, Sacks did not give specific reasons as to why he did
not have an expert review the videotape. Based on this testimony at the motion for
new trial, appellant asserts that his trial counsel “had no legitimate strategy to not
contact an expert and because of his ignorance of the literature, counsel did not know
how an expert might be of assistance based on the facts of the instant case.”
          The United States Supreme Court has explained “[s]trategic choices made after
thorough investigation of law and facts relevant to plausible options are virtually
unchallengeable; and strategic choices made after less than complete investigation are
reasonable precisely to the extent that reasonable professional judgments support the
limitations on investigation.” Wiggins v. State, 539 U.S. 510, 521–22, 123 S. Ct.
2527, 2535 (2003) (quoting Strickland, 466 U.S. at 690–91, 104 S. Ct. 2066). In
other words, counsel has a duty to make reasonable investigations or to make a
reasonable decision that makes particular investigations unnecessary. Id. In any
ineffectiveness case, a particular decision not to investigate must be directly assessed
for reasonableness in all the circumstances, applying a heavy measure of deference
to counsel’s judgments. Id. at 521–22.
          In support of his argument that his counsel was ineffective because of his
nonstrategic decision in failing to seek an expert’s opinion, appellant relies on the
recent Texas Court of Criminal Appeals decision in Ex parte Briggs, 187 S.W.3d. 458
(Tex. Crim. App. 2005). In Briggs, an injury-to-a-child case, the court concluded that
“the failure by [Briggs’s] attorney to take any steps to subpoena the treating doctors,
withdraw from the case because [Briggs’s] indigency prevented him from providing
constitutionally effective assistance of counsel, or request state-funded expert
assistance . . . constituted deficient performance.” Id. at 469. The court, in discussing
trial counsel’s failure to consult an expert to review medical records of the deceased
child noted, “[t]his was not a ‘strategic’ decision, it was an economic one.” Id. at
467. The court further noted that there had been no suggestion that trial counsel
declined to fully investigate the medical records because he made a strategic decision
that such an investigation was unnecessary or likely to be fruitless or
counterproductive. Id. Instead, Briggs’s trial counsel had stated to his client that he
could not fully investigate the medical records or consult with experts until he had
been paid an additional $2,500–$7,500. Id. at 466. The court held that “[Briggs]’s
trial counsel’s financial decision to do nothing about the obvious need to develop
evidence concerning [the complainant’s] medical history did not reflect reasonable
professional judgment.” Id. at 469 (citing Wiggins, 539 U.S. at 534, 123 S. Ct. at
2541–42). The court concluded that “[t]his was not a ‘strategic’ decision made after
a full investigation of the facts and law.” Briggs, 187 S.W.3d at 469. 
          Here, as in Briggs, appellant’s trial counsel did not have a strategic motive for
not fully investigating the complainant’s therapy sessions or utilizing an expert to
review Spears’s notes or assist in the cross-examination of witnesses. In Briggs, trial
counsel’s decision was based on an economic rationale rather than a strategic one. 
In this case, Sacks explained that he did not hire an expert because (1) he was told
that any expert he hired would not be able to interview the complainant, and (2) by
the time he had received Spears’s notes, he did not have time to contact an expert. 
Neither of these offered justifications constitutes a legitimate reason for Sacks’s
failure to fully investigate the facts relevant to appellant’s case. Sacks also stated that
he had difficulty reading Spears’s report, and thought that Spears would provide a
report with his findings. Again, the fact that Sacks had difficulty reading Spears’s
notes does not constitute a strategic or otherwise permissible reason for Sacks’s
failure to review the complainant’s therapy records, particularly those records
containing evidence that was obviously exculpatory. Instead, the record reflects that
none of the potentially exculpatory evidence contained in Spears’s notes was ever
presented to the jury in appellant’s trial. 
          An error in trial strategy will be considered inadequate representation only if
counsel’s actions are without any plausible basis. Ex parte Burns, 601 S.W.2d 370,
372 (Tex. Crim. App. 1980); Nelson v. State, 881 S.W.2d 97, 101 (Tex.
App.—Houston [1st Dist.] 1994, pet. ref’d). Given the nature of the allegations,
Sacks’s defensive theory of the case, and the exculpatory evidence contained in
Spears’s report, we conclude that it was unreasonable for Sacks to not fully
investigate the contents of Spears’s notes or consult an expert to pursue appellant’s
defensive theory. Sacks’s stated reasons for not consulting with an expert, namely,
that the expert would not be able to interview the complainant, that he did not have
time after looking at Spears’s notes, and that he had difficulty reading the notes, do
not justify his failure to fully investigate the complainant’s therapy or explore other
evidence, such as expert testimony, that would have supported appellant’s defensive
theory. Counsel’s investigation did not reflect reasonable professional judgment. See
Wiggins, 539 U.S. at 534, 123 S. Ct. at 2541–42. Accordingly, we hold that
appellant’s trial counsel’s performance was deficient.
          Further, and as noted above, to prevail on a claim of ineffective assistance, an
appellant must not only show deficient performance by trial counsel, but must also
show, beyond a reasonable probability, that, but for counsel’s deficient performance,
a different result would have occurred. Thompson, 9 S.W.3d at 812. A reasonable
probability is a probability sufficient to undermine confidence in the outcome. Id.
          Initially, we note that the record reflects that appellant’s trial counsel did
consider possible fabrication and undue influence regarding the complainant’s
outcries. The record in this case includes a motion, filed December 8, 2003, wherein
appellant, represented by Sacks, argued that the complainant’s recorded interview
should be suppressed at trial because “the questions were leading and suggestive of
the answers for the child” and “the mother . . . is extremely biased in this matter.” 
Appellant’s subsequent motion to take testimony of the complainant was denied. 
During Sacks’s cross-examination of the complainant, the complainant testified that
the prosecutor and Spears had coached her answers and told her what to say. Also,
as noted, appellant testified that he believed the charges were due to his refusal to co-operate with Fair-Wright’s desire to move out of the country with the children. Sacks
also elicited testimony from a CPS investigator regarding the complainant’s
statements during her videotaped CAC interview, in which she stated that appellant
did not know that she had seen him masturbate. 
          However, despite the obvious strategy by Sacks to discredit complainant’s
outcry and prove fabrication or improper influence, he was entirely unaware of the
contents of Spears’s notes, including exculpatory evidence that would have advanced
appellant’s defensive theory. Sacks never presented evidence showing Fair-Wright’s
presence at nearly all of the complainant’s therapy sessions. Moreover, Sacks never
introduced into evidence the complainant’s own statements, contained in Spears’s
notes, that “the court won’t let [the complainant] see her dad because her mom is
making them say that.” Nor did he introduce into evidence the complainant’s
statement at the April 27, 2004 session that appellant “thought [the complainant] was
asleep” and “never asked her to help him ‘get the milk out’”—statements consistent
with the complainant’s initial comments during her CPS interview.
          Moreover, we note that because Sacks failed to fully investigate the
complainant’s therapy notes, he could never have recognized any possible diversions
from standard protocol of interviewing child sexual assault victims. If Sacks had
uncovered such evidence, expert testimony such as that given by Dr. Brown at the
motion for new trial could have been used to further advance appellant’s defensive
theory. Brown’s testimony regarding false allegations of sexual assault occurring
after a divorce and the accepted protocols for interviewing suspected child sexual
assault victims would have been admissible as long as he did not comment directly
about the truthfulness of the complainant in this case. See Schutz v. State, 957
S.W.2d 52, 59 (Tex. Crim. App. 1997).
          The bottom line is that exculpatory evidence in Spears’s notes, expert
testimony about deviations from standard protocol reflected in the notes, and expert
testimony regarding false allegations of sexual assault in connection with divorce
proceedings constitute powerful evidence that would have supported appellant’s
defensive theory. At the very least, the assistance of such an expert to assist in the
cross-examination of the adverse witnesses in this case could have made a significant
difference in regard to the outcome of this case.
          Accordingly, “without regard for the idiosyncrasies of the particular
decisionmaker,” we conclude that there is a reasonable probability, sufficient to
undermine our confidence in the outcome of the case, that but for the deficient
performance of trial counsel, the result of the proceedings would have been different. 
See Briggs, 187 S.W.3d at 470 (quoting Hill v. Lockhart, 474 U.S. 52, 59–60, 106 S.
Ct. 366 (1985)).
          We sustain appellant’s two issues.
 
 
 
 
 
 
Conclusion
          We reverse the judgments of the trial court and remand for proceedings
consistent with this opinion.
 
 
 
                                                                        Terry Jennings
                                                                        Justice 
 
Panel consists of Justices Jennings, Hanks, and Higley.
Publish. Tex. R. App. P. 47.2(b)