IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE    )
    )
V.    )   ID NO.: 1405016171
    )
MANUEL SALABERRIOS    )

Decided: November 2, 2020

## MEMORANDUM OPINION

*Upon Consideration of*
*Defendant's Amended Motion for Postconviction Relief.*
**DENIED.**

Barzilai K. Axelroad, Esquire, DEPARTMENT OF JUSTICE, Wilmington, Delaware. Attorney for the State of Delaware.

Natalie S. Woloshin, Esquire, WOLOSHIN, LYNCH & ASSOCIATES, P.A., Wilmington, Delaware. Attorney for Defendant.

**BUTLER, J.**

The Court is here called upon to rule on a motion filed pursuant to Super. Ct. Crim. R. 61. Charged with assault in a detention facility, Manuel Salaberrios was found guilty by a jury of a lesser included offense of attempted assault in a detention facility. The irony is that he actually did assault someone in a detention facility. But we are getting ahead of ourselves.

## FACTS AND PROCEDURAL HISTORY

The facts of what happened here are told on a piece of videotape, introduced at trial. The video was taken from a stationary camera in a day room at the Central Violation of Probation Center wherein about 20 inmates are sitting or standing around, obviously engaged in routine small talk. An individual identified as Salaberrios walks through the room at a leisurely pace and can be seen approaching a small group of men, exchange a few words, and then commence to punch the putative victim several times in the head and upper body, knocking him down. The victim does not appear to be fighting back, the assault lasts all of about 8 seconds and Salaberrios disengages and retreats back across the room. The victim stands up and no one else moves until guards walk into the room about 20 seconds later. They approach Salaberrios, who is then walked out of the room without fanfare or resistance.

The victim, Scott Kuntz, was photographed at some point shortly after the incident at DCC. That photo, introduced at trial, depicts no visible injury to Kuntz,

1

although a nurse reported a bruised lip. That photo was as close as the jury got to ever laying eyes on the victim. He had apparently been released from prison before trial and did not appear in court to testify. Thus, trial was a rather straightforward affair involving the introduction of some foundation questions and playing a video tape from the stationary camera in the break room.

The prosecution obtained a grand jury indictment for assault in a detention facility. This offense provides that an inmate who "intentionally or recklessly causes physical injury to . . . any other person at a detention facility" is guilty of a class D felony.[1] Since both Salaberrios and Kuntz were obviously confined in a detention facility, and the video depicted Salaberrios striking Kuntz without apparent provocation, his "intentionality" or recklessness was not really at issue. The only real issue in the case was whether Kuntz suffered "physical injury." Physical injury is defined by the Code as "impairment of physical condition or substantial pain."[2] But the State had a problem: because Mr. Kuntz did not appear for trial, it had no way to prove impairment of physical condition or, based only on the photograph of the victim, substantial pain.

[1] 11 *Del. C.* § 1254.
[2] 11 *Del. C.* § 222(23).

2

Defense counsel recognized the issue and requested a lesser included offense instruction of offensive touching, the most serious assaultive offense that does not require a finding of physical injury.[3]

The prosecution responded with a different theory for liability. The prosecution argued that since "attempt" is a lesser included offense of every completed offense,[4] the defendant could be found guilty of "attempted assault in a detention facility." Because an attempt to commit a crime is graded at the same level as the completed offense,[5] the State was no worse off for the wear. The Court granted both parties' requests for lesser included offense charges.

The jury convicted the defendant of attempted assault in a detention facility. The State then filed its motion to declare the defendant a habitual offender, a motion the defense had no good faith basis to oppose. Thus, an assault that lasted about 8 seconds, resulted in no visible injuries and was prosecuted without a complaining witness resulted in an 8 year jail sentence, or one year for each second of the incident.

Defendant duly filed his direct appeal and the conviction was duly affirmed by the Delaware Supreme Court.

Defendant has now presented a motion for relief under Rule 61, arguing that his trial counsel rendered ineffective assistance of counsel and asking for relief in

---

[3] 11 *Del. C.* § 601.
[4] 11 *Del. C.* § 206(b)(2).
[5] 11 *Del. C.* § 531.

3

the form of a new trial. The basis for this request is an argument that trial counsel failed to investigate substantial evidence of Salaberrios' mental health issues and failed to either assert them in defense of the charges or utilize them effectively in mitigation of his sentence.

## THE ISSUE RAISED HEREIN

The mitigation and psychiatric data collected by Rule 61 counsel is substantial. Records reviewed by Rule 61 counsel indicate that Salaberrios' mother was on methadone maintenance at his birth and addicted to cocaine, heroin and alcohol. He suffered symptoms of drug withdrawal at birth. He was abused by his father, sexually abused by his step-father and placed in foster care at age 7. He dropped out of school by 9th grade and began abusing alcohol at about the time his sister was diagnosed with schizophrenia. He was hospitalized at the Delaware State Hospital in 1996 and 1997 with a diagnosis of a personality disorder.

In 2005, Salaberrios was before the Court for one of his probation violations and a judge ordered a psychiatric evaluation. At that time, a TASC report called for inpatient Level 4 treatment with mental health and work release access. The requested psychiatric report, however, opined that his difficulties were likely the result of drug abuse and an antisocial personality, not schizophrenia or other mental condition.

4

The argument goes that these records were all available from the Delaware State Hospital, but defense counsel failed to request them or make any use of them to either 1) argue in mitigation of the offense to the prosecutor or 2) assert a mental illness defense, such as guilty but mentally ill or not guilty by reason of insanity.

The State counters that the affidavit of Defendant's trial counsel appended the "Adult Medical/Psychological History" of the Defendant, apparently a part of the Public Defender's routine intake materials. It fails to note any history of psychiatric treatment. To the question whether his "current legal problems are related to mental health problems," he answered "No." To the question whether he had "ever been treated for mental health problems" he answered "No."

Finally, Salaberrios' Rule 61 counsel notes that trial counsel's records reflect two instances in which counsel was put on notice that defendant's mental health was at issue. In one letter, Salaberrios' brother asked counsel to contact Salaberrios saying "he may need help. He says I should get a mental health evaluation." This letter did provoke counsel to contact Salaberrios' brother and the attorney noted in his file that "He gave some decent mitigation" but is not otherwise descriptive of what the mitigation was or whether a mental health defense was present.

Salaberrios himself wrote to trial counsel that "I want a mental health evaluation to show proof that I'm having a terrible time coping with my loss." There is no evidence that this letter resulted in any action by trial counsel.

## ANALYSIS

The push-pull between the parties raises the question of the scope of trial counsel's duties to investigate a potential mental health defense, be it in defense of the charge or mitigation of the sentence. Defendant raises some impassioned arguments that if his mental health issues had been investigated more fully, he'd have received different treatment.

Salaberrios points the Court first to *Wiggins v. Smith*, a U.S. Supreme Court case challenging counsel's failure to investigate.[6] In that case, the defendant was charged with drowning a woman in a bathtub while ransacking her home. The trial defense focused on the evidence of his guilt for the crime but overlooked significant evidence of Wiggins' truly depraved upbringing. *Wiggins* was a capital case in which a single juror could have refused to vote for execution. But none of the mitigating evidence was presented in the capital phase of the trial. The Supreme Court reversed and remanded.

The defense here posits that *Wiggins* stands for the proposition that mitigation evidence must be pursued as a matter of constitutional law. But the holding is a bit narrower than that. In a non-capital case, particularly one such as this involving the mindless application of statutory, mandatory sentences, mitigation may have some value in warming the heart of a prosecutor, but it has no effect on the Court, which

---

[6] 539 U.S. 510 (2003).

is relegated to simply filling out the paperwork supporting the prosecutor's unilateral decision to file a habitual offender motion.

The defense makes the argument that mitigation evidence may have changed the prosecutor's mind, but because it was never pressed, the prosecutor was not persuaded. While the point is well made, the fact is, even now, the prosecution is unpersuaded. There is simply no evidence that revelation of Salaberrios' mental health or poor upbringing would have moved the prosecutor, who to this day insists that Salaberrios should serve 8 years in jail for this 8 second assault resulting in minor injuries. It is therefore mere speculation that uncovering and relaying these facts pretrial would have moved the prosecutor to reduce his demand.

Salaberrios further directs the Court to *Rompilla v. Beard*, another Supreme Court case in which trial counsel for a capital murder defendant failed to review the records contained in a prior criminal filing, which would have revealed a significant history of parental abuse.[7] But again, *Rompilla* was a capital case in which mitigating evidence is often crucial. Moreover, the defense knew that the prosecutor intended to use the same prior criminal filing as an aggravating factor in the penalty phase.

Perhaps sensing that these capital cases only take the argument so far, Defendant points the Court to *Weeden v. Johnson*, a 9th Circuit case reversing a non-

---

[7] 545 U.S. 374 (2005).

capital murder/robbery conviction.[8]  In *Weeden*, the argument was that defendant's trial counsel was ineffective for failing to investigate avenues of emotional and psychiatric vulnerabilities of the defendant, a 14 year old girl who got caught up in a botched robbery leading to a homicide.  By the time the convictions reached the 9th Circuit, the Court said, "The correct inquiry is not whether psychological evidence would have supported a preconceived trial strategy, but whether Weeden's counsel had a duty to investigate such evidence in order to form a trial strategy, considering 'all the circumstances.' . . . The answer is yes."[9]

Each of the cases above found trial counsel deficient in cases where a life or death sentence was in the balance.  That is surely a part of "all the circumstances" calling for an exacting review of the defendant's upbringing, psychological and emotional history, and any other factor that might impact his pass through the legal peril in which he finds himself.

But can it be that defense counsel is held to the same duty to investigate the defendant's psychiatric background when guilt is, well, on videotape and life is not in the balance?  Surely, "all the circumstances" require counsel to triage when and where his time and investigative resources will be spent.  This is all the more so

---

[8] 854 F.3d 1063 (9th Cir. 2017).
[9] *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 691 (1984)).

when the defendant's initial screening questionnaire raised no reason to suspect a mental health issue.

Moving along, the defense cites *State v. Fedorak*, a Washington Court of Appeals case and *Lampkin v. State*, a Texas Court of Appeals decision.

First, *Lampkin* was an "only in Texas" case. The defense here cites it as a DUI conviction, but it was not just any DUI conviction. Recall that in Texas, a defendant may elect to have jurors determine the sentence.[10] In Lampkin's case, the jury imposed a 99 year jail sentence, for a "third or subsequent offense," .11 BAC, no accident, DUI. As with the homicide cases discussed above, the appeals court found the sentencing phase of the trial deficient in that trial counsel failed to investigate or present substantial mitigating evidence regarding defendant's mental health that might have impacted the juries' sentencing deliberations.

The *Fedorak* case from Washington was a murder case in which the defendant's psychotic behavior was obvious from the outset. Indeed, police were called because of the defendant's erratic behavior toward the decedent, who was found bludgeoned to death in a ravine adjoining the house just minutes after their arrival. Fedorak's arrest was accompanied by various manifestations of an active psychosis, all of which would have been duly noted in the police reports.

---

[10] Tex. Code Crim. Proc. Ann. art. 37.07 § 2(b) (West 2019).

Nonetheless, it was not until the eve of trial that counsel sought a continuance in order to pursue a mental illness defense. The State, conceding that such a defense was present on the facts and that such evidence "could change the outcome of the trial," nonetheless successfully resisted the continuance and the case proceeded to trial and conviction. The Court of Appeals reversed, finding that the failure to investigate the obvious, well-documented mental health history of the accused was constitutionally deficient performance.

We understand from these cases that the duty to investigate the mental health of the defendant is somewhat dependent on what the goal of the assessment is. If the question is whether the mental state at the time of the offense may constitute a complete or partial defense to the charge, then surely research into the defendant's mental state at the time may fall below the *Strickland* standard of reasonableness. But from the evidence in this case, it cannot be fairly argued that a not guilty by reason of insanity verdict ("NGRI") was even a remote possibility. The defendant was fully cognizant of his surroundings and knew his conduct was wrong when he did it. Even the broadest reading of the psychiatric reporting in the record fails to

support a not guilty verdict and indeed, a jury instruction on NGRI seems like a remote possibility on this record.[11]

Guilty But Mentally Ill ("GBMI") suffers from the double difficulty of being a long shot at best, but also of putting the defendant in no better place than the guilty verdict did. The habitual offender petition would still have netted the Defendant his mandatory 8 years, the only difference being that he would have served some of the time at the State Hospital and most of it in the same prison he is in right now.

There is no evidence in this record from which it is a fair conclusion, or even a fair guess, that there was a mental illness defense available to the defendant even if counsel had pursued a deep dive into defendant's mental health at the time of the

---

[11] The defense argues that with the known psychiatric history available to defense counsel at trial, these verdicts were possible. But the argument is wistful at best. At his sentencing, the defendant engaged the Court as follows:

The Court: Did you know it was wrong when you did it?

Defendant: Yeah, I knew it was wrong. I was having a bad day. I just – I tried to walk away.

The Court: But you didn't walk away. You walked up to him, man, I saw it. You walked right up to him.

Defendant: I was arguing with him at the table, and then I got up and walked away. And he kept it going. I was trying to calm him down, and then I went down and sat down.

The Court: You got an anger problem.

Defendant: Yes I do.

11

offense. And as discussed above, there is no evidence that the prosecution, presented with the psychiatric history now laid before the record, would have forsaken its right to habitual offender sentencing and the 8 year mandatory sentence.

The case law that has developed thus far has found a duty to investigate in "high stakes" cases where mitigation is presented to the jury. In this case, defendant denied any mental health issues initially. Correspondence from defendant's brother and himself suggested that his mental health was problematic and it may be that the trial counsel was placed on some "inquiry notice" upon receiving this correspondence. The Court would be inclined to call the matter for further hearing to further develop this issue if it were headed anywhere.

But here is where Defendant's argument goes from abstractly interesting to untenable. If trial counsel was placed on notice of a potential psychiatric issue based on the correspondence he received, Defendant makes an unconvincing case that counsel could have done anything with it. Under the *Strickland* standard, the Court must be satisfied that the deficiency in counsel's performance was sufficiently related to the issues in the case as to undermine confidence in the outcome of the trial.[12] This Court is not. The proffered evidence would not have sufficed to get

---

[12] *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

Defendant jury instructions on NGRI and GBMI would not have affected his custodial status. Defendant's trial counsel was not dealing with a prosecutor that has demonstrated the slightest interest in Defendant's life story and the evidence would thus have been of dubious mitigation value.[13] Barring some affirmative evidence that counsel's failure to investigate might have changed the outcome, the Court is duty bound to deny relief.

Defendant raises the argument that the State's habitual offender motion did not 1) specify the convictions relied on in order to declare Defendant a habitual offender or 2) assert that there was time for rehabilitation between qualifying convictions.[14] Defendant argues that this renders the petition facially deficient and trial counsel's failure to challenge the motion prejudiced him. The standard for specification of convictions, however, is low - Delaware law generally views the assertions of three convictions with at least some amount of time in between as sufficient specification of convictions and time to permit rehabilitation.[15] In order

---

[13] At one point, Rule 61 counsel tried to work around the difficulties in Defendant's predicament with an application under the recent amendments to the habitual offender statute, 11 *Del. C.* § 4214(f), but was again met with the same intransigence in those proceedings he has met here.

[14] Def. Supp. Am. Mot. Post-Conviction Relief 4.

[15] 11 *Del. C.* § 4214(b); *Sammons v. State*, 68 A.3d 192, 196 (Del. 2013) (holding sufficient period to permit rehabilitation is shown when the record reflects there were nine months between the end of Defendant's prison term for a 1991 burglary charge and the arraignment for his 1994 burglary charge); *Wehde v. State*, 983 A.2d 82, 85-86 (Del. 2009) (holding sufficient period to permit rehabilitation is shown when the State shows a one year period of probationary supervision); *Mayo v. State*, 137 A.3d

to show prejudice under *Strickland*, Defendant must show that but for trial counsel's failure to challenge the State's motion, the Defendant would not have been sentenced as a habitual offender and would have received a lesser sentence.[16]

The State outlined seven felony convictions over the course of fifteen years.[17] There are several probationary periods—multiple years in length—interspersed between the convictions.[18] This falls well within the statutory requirement that the State demonstrate three convictions with at least some time between events to show a sufficient period to permit rehabilitation. As such, Defendant's argument that the motion was facially deficient is without merit. The Court therefore finds the State did not fail to 1) specify convictions relied on and 2) assert there was time for rehabilitation between convictions, and the failure to challenge the motion as facially deficient was not ineffective assistance of counsel.

Finally, Defendant has raised an issue concerning the State's failure to designate between violent and non-violent offenses in its habitual offender motion. That issue is fully answered by *State v. Lewis*.[19] *Lewis* held that identification of

---

970, 2016 WL 2585885, at *2 (Del. Apr. 21, 2016) (TABLE) (holding sufficient period to permit rehabilitation is shown when the record reflects Defendant's convictions occurred in 2000, 2004, and 2009).

[16] 466 U.S. at 694.

[17] State Resp. Def. Supp. Am. Mot. Post-Conviction Relief 14, n.44.

[18] *Id.*

[19] *State v. Lewis*, 2018 WL 4151282, at *2 (Del. Super. Aug. 28, 2018), *aff'd*, 211 A.3d 137, 2019 WL 21575519, at *1 (Del. May 16, 2019) (TABLE).

14

violent versus non-violent felonies was irrelevant to motions filed before the Habitual Criminal Act was revised because it was "something that was of no moment to the State when filing, nor the Court when granting a habitual criminal petition under the old law."

## CONCLUSION

Based upon the foregoing, Defendant's motion for relief under Super. Ct. Crim. R. 61 must be **DENIED**.

**IT IS SO ORDERED**.

Judge Charles E. Butler